Luther O. DYER and Sharon
Dyer, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Joyce WILLIAMS, Administratrix of the
Estate of Rodney Allen Williams,
Deceased, Plaintiff,

v.

UNITED STATES of America.

Nos. G 79–408, G 80–42.

United States District Court,
W.D. Michigan, S.D.

Nov. 18, 1982.

Donald Exelby, Grand Rapids, Mich., for Dyer.

Vernon Kortering, Muskegon, Mich., for Williams.

H. Richmond Fisher, Torts Branch, U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

ENSLEN, District Judge.

Plaintiffs have brought these consolidated actions under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and Section 2674 alleging that the negligence of the Air Traffic Controller at the Kent County Airport, Grand Rapids, Michigan proximately caused the crash of the aircraft piloted by Plaintiff Dyer.

Mr. Dyer, a non-instrument rated pilot was flying a non-instrument equipped Cessna 172 N5606R (06R) on a night cross country flight from Fremont, Ohio to Fremont, Michigan. Rodney Williams, Plaintiff Williams' decedent, was a passenger and co-worker of Plaintiff Dyer. The two men had departed for Fremont, Ohio on the afternoon of July 29, 1977 in order to repair a pickle packing machine for a customer of their employer. The aircraft in question, owned by Mr. Carol Schaeffer, was leased for the occasion to Wilde Manufacturing Company, Plaintiffs' employer.

The government denies that any negligent or wrongful act of its employees proximately caused or in any way contributed to the accident. The government asserts that the accident and damages alleged by Plaintiffs were caused not only by the negligence of Plaintiff Dyer, but also by his reckless, willful and wanton misconduct. The United States maintains that the pilot was aware of the dangerous and hazardous conditions which existed and that by willfully and knowingly proceeding into those conditions, he assumed the risk of the loss which was suffered.

After trial on the merits, this Opinion and Order constitutes my findings of fact and determination of law as required by Rule 52(a) FRCP. Because the applicability and significance of various government regulations materially affects the result here, and because the parties dispute the significance of action or inaction by the air traffic controller, the capacity of the Federal Aviation Agency radar systems, and the capacity of the plane, I have set forth the contentions of the parties in addition to my determinations.

Plaintiffs charge that the Air Traffic Controller, who was the sole controller on duty at the Kent County Airport on the night in question, negligently declared an emergency and trapped the pilot, who was licensed to fly under visual flight rules in instrument flight rule conditions.[1] Plain-

1. During the day, there are six positions to be operated by controllers at the Kent County Airport with one supervisor present. From midnight to 8:00 a.m. one controller operated

tiffs claim that as a substantial consequence of such negligence the aircraft crashed, killing the passenger and injuring the pilot. Plaintiffs believe that part 65 of the Federal Aviation Regulations (FAR's) rules and regulations which is published in the Air Traffic Controller's Manual (ATCM 711.65) establishes the standard of care for controllers. Additionally, they assert that the controller must utilize the care expected of a reasonably prudent controller under the same or similar circumstances whether or not the manual provides any rules.

The Plaintiffs argue that the lack of training and proficiency of the Air Traffic Controller contributed to the bad instructions given to 06R and in the lack of proper advice being given.[2] They argue that the controller should not have declared an emergency, but rather should have directed the pilot to Kalamazoo as the fuel supply and weather conditions would have permitted this alternative. Plaintiff's expert Frank McDermott, claims the controller violated mandatory procedures and created the emergency by her mishandling of the situation.

Mr. McDermott has had extensive experience in air traffic control. He at one time served as Technical Advisor to the Director of Research, Federal Aviation Agency, has trained air traffic controllers, and has represented the United States as a delegate to international meetings on air safety ·on three occasions. Presently, he operates a consulting firm in matters of air safety.

According to Plaintiffs, 06R had a cruising speed of 130 mph or 2.17 statute miles per minute. With full tanks, at cruise speed, they state that the aircraft had a flight endurance of 4.6 hours. They assert that the fuel tanks had been filled prior to the return trip from Fremont, Ohio and that the plane had a total capacity of 42 gallons or 39 usable gallons. Since the plane took off shortly after midnight, (0400Z) and crashed, at or about 0654.20Z, Plaintiffs claim that the plane had fuel for at least two hours of flight remaining.[3]

Mr. Dyer obtained his pilot's license in July of 1975. At the time of his departure for Fremont, Ohio on July 29, 1977, he had at least 140 hours of flight experience and had received 2.7 hours in instrument training prior to being licensed. Dyer maintains that he was briefed on weather conditions by the Saginaw Flight Service at the time of his departure on the morning of July 29 and that the weather at that time was VFR. He states that he heard a controller transmission to another pilot after he took off on his return flight which reflected VFR conditions and that it was not until he neared the Grand Rapids, Fremont, Michigan area that he first realized that he was over an area of developing ground fog.

At 0641.10Z Dyer contacted the Grand Rapids Tower and requested assistance. After Dyer refused to declare an emergency, the controller declared that an emergency existed. Thereafter, the pilot contends that he followed advice and instructions, both express and implied, given by the con-

all positions, including that of supervisor. The Civil Service Commission has set forth the minimum standard of care required for Air Traffic Controllers in its Position Classification Standards Transmittal Sheet No. 75 published July, 1968:

The principal objective of air traffic control work is to insure the safe, orderly, and rapid movement of aircraft through the nation's airspace. To accomplish this objective, air traffic control specialists advise, inform, and instruct pilots before and during flights. They work through a vast communications network that links them directly to pilots and to each other.

Air traffic control specialists provide a wide variety of weather, navigational and other valuable flight information to pilots. They assist pilots who are lost or in difficulty. They initiate search and rescue action for aircraft that fail to report within stated time limits. Along the airways and around airports they keep aircraft properly separated by issuing speed, altitude and heading instructions to pilots.

Pilots rely heavily on the information, advice and instructions provided by air traffic control specialists. *Responsibility for life and property is the primary characteristic in this occupation. Id.* at 3 (emphasis in original.)

2. See Attachment A (Transcript of tape of conversation between controller and pilot).

3. Time is Greenwich Mean Time.

troller. He asserts that he was VFR on top of the fog until the controller directed him into IFR conditions and that the emergency was "created" by this negligence.

Furthermore, the pilot states that the Kent County Airport has six runways and that Runway 26L, which the pilot was attempting to use, has all the necessary ground facilities to handle a fully instrumental approach (ILS). The airport also has ASR radar with which a surveillance radar approach can be conducted: i.e., a radar assisted approach. At the time of the accident, the Kalamazoo Airport did not have radar but was equipped with a manned control tower and approach light. The Kalamazoo Airport is located 40 nautical miles or 46 statute miles south of Grand Rapids.

Grand Rapids Radar Control Zone (GRR ATCT 7210.10A) establishes that an aircraft "vectored" under IFR conditions must be maintained at an altitude at or above the minimum for proper obstacle clearance which varied between 2500' to 2000 mean sea level (MSL) for the relevant ground tract of 06R.

Plaintiff Dyer asserts that the Controller's Handbook (ATCM 711.65) required the controller to follow certain operating practices in addition to exercising good judgment:

> This handbook . . . is one of the air traffic control manuals referred to in Part 65 of the Federal Aviation Regulations. Controllers are required to be familiar with the provisions of this handbook which pertain to their operational responsibility and to exercise their best judgment if they encounter situations not covered by it.

> The provisions of the ATCM are mandatory when proceeded by "shall, or an action verb in the imperative sense."

(*See,* ATCM Chapter 1, word meanings (a) Examples issue; authorize.)

Plaintiffs contend that the controller failed to follow the procedures set forth in the manual after she felt that an emergency existed. They argue that she should have called the Chicago Center to alert it to a possible emergency and that this failure to obtain the assistance of the Chicago Center handicapped her in handling the problem. ATCM 1552, 1553, 1575, 1555. They charge that she should have gathered the necessary information to enable her to determine the top of the ground fog in the Grand Rapids area and the existing weather at any other place that might serve as a potential destination for an aircraft in trouble. They claim that even though the controller did call Kalamazoo, she erroneously told the pilot that Kalamazoo was IFR but did not state that it had considerably better weather than Grand Rapids. Plaintiffs state that the controller did not attempt to find out whether Battle Creek or Jackson weather conditions would permit a VFR landing.

Once an emergency is declared, Plaintiffs charge that Section 1551 of the ATCM requires the controller to "obtain enough information to handle the emergency intelligently," and that Section 1570(a) requires the following minimum information be obtained.

(1) The controller should ascertain the aircraft identification and type. Plaintiffs assert that the controller failed to do this.

(2) The controller should ascertain the weather as reported by the pilot. Plaintiffs contend that the controller never *accurately* ascertained the weather. The pilot claims that he was VFR on top while the controller thought he was IFR.

(3) The controller should determine the type of emergency. The pilot alleges that he was seeking information regarding his location and wanted weather assistance and not immediate assistance to land.

(4) The controller should determine the aircraft altitude. Plaintiffs charge that this information was not obtained timely, and that almost eleven minutes passed before it was obtained.

(5) The controller should determine what the pilot desires. Dyer claims that the controller never answered how far south he had to go before he got out of fog conditions.

(6) The controller should find out how much fuel remaining in time exists. Plaintiffs stated that the controller only determined that the pilot had about one quarter tank of fuel.

Plaintiffs admit that it is not a mandatory order for these items of minimum information to be gathered, but that failure to ask two out of six of them, misinterpretation of three out of six of them, and the late timing of the sixth reinforces a finding of negligence.

In Plaintiffs' view, failure to follow standard operating procedure meant that the controller was unable to handle the emergency. Section 40 of the ATCM has a mandatory requirement that a controller "... stay aware of current weather information needed to perform air traffic control duties." They claim that the controller was unaware of the surrounding weather conditions and was therefore unable to assist in finding an alternative landing site.

Another indication of the controller's negligence, according to Plaintiffs, was the failure to maintain frequent communication with the pilot. They assert that she permitted long lapses without talking to a lost pilot in breach of her fundamental duty of care.

Plaintiffs charge that by failing to direct the pilot to Kalamazoo, the controller violated sections 1553, 1554, 1555, and 1575 of the ATCM, and that by having undertaken to provide radar assistance to a non-instrument rated pilot in IFR conditions, she violated mandatory provisions of Section 1592(d) of the ATCM by giving directions to turn while climbing/descending and by failing to vector to VFR conditions. Furthermore, Plaintiffs charge that the controller did not issue an altimeter setting or ever issue minimum safe altitudes or minimum descent altitudes in violation of the ATCM and local procedures.

The pilot claims that this negligence in giving or failing to give directions caused him to become spatially disoriented. The controller told the pilot to look down to see the airport. Dyer asserts that this is an extremely dangerous procedure and that the controller is trained to avoid this danger by advising pilots to watch the altitude and the instruments and should never advise the pilot to look out the window. Dyer asserts that the controller issued heading changes after commanding the descent and that it was reasonable for the pilot to interpret these "communications" as commands in light of the fact that an emergency had been declared. By requesting the pilot advise her if he saw the runway lights, the Plaintiff claims that she told him to look out of the window in spite of the fact that there was a passenger on board who could have made the observations. They say that to encourage a pilot to make a 90 degree turn and at the time to attempt to see surface lights through solid overcast constituted negligence.

The latest weather reported to 06R was indefinite ceiling two hundred, sky obscured, visibility one-quarter of a mile with fog. At Kalamazoo, although the controller first reported that it was still VFR (at 0642:25Z), he changed that report to a visibility of two miles and coming down. (See footnote 2.) Plaintiffs believe that they should have safely made the 21 minute flight to Kalamazoo at cruise speed.[4]

By committing the pilot to land at Grand Rapids, knowing that he had no known ability to do so, but had known abilities to land under VFR conditions and knowing that he had sufficient fuel to land safely at Kalamazoo or another VFR field, and requiring precision maneuvers of a VFR pilot trapped in the clouds, the Plaintiffs maintain that the controller proximately caused the accident.

The government disputes Plaintiffs' allegations. The government points out that

4. Although the Kalamazoo controller reported that the weather was becoming worse, per the tape recording, the official surface weather observations made and recorded by the Kalamazoo Controller never listed the visibility as less than three miles for the relevant periods. Plaintiffs assert that even if Kalamazoo was below the three mile minimum, it was far superior to Grand Rapids and qualified for a special VFR clearance to land.

Mr. Dyer was a private pilot who was only permitted to fly when the weather exceeded certain minimums established by the FAR's. 14 CFR § 91.105. According to the United States, Mr. Dyer was informed prior to his departure on July 29 that weather conditions for VFR pilots were marginal and the Flight Service Specialist in Saginaw advised him that VFR flight was not recommended. Disregarding this advisory, Mr. Dyer flew to Ohio.

Having finished repairing the pickle packing machine late that night, the two men departed Fremont, Ohio for the return trip shortly after midnight. Even though there was a telephone at the plant so that he could have obtained a pre-flight weather briefing, as 14 CFR § 91.5 and common sense dictate before making a cross country flight, Mr. Dyer did not do so. He flew over Waterville, Ohio, up to Jackson, Michigan, past Grand Rapids, and up to Fremont. Although he could have contacted a Flight Service Station at any point along this route to obtain a complete weather briefing, he did not do this either. The government alleges that the pilot did not even obtain a weather briefing when he lost contact with the ground. If he had checked the weather reports, he would have been advised that his destination had a visibility of one quarter mile with fog, with the VFR visibility minimum of three miles.

Unable to find the airport at Fremont, the aircraft continued to Muskegon, where the pilot again failed to find an airport because of adverse weather conditions. The government contends that the pilot needlessly consumed valuable fuel during this time when he could easily have returned to Jackson which was VFR if he had sought the necessary information.

At 0641.90Z, the pilot contacted the control tower at Grand Rapids. The controller informed the pilot of the existing weather conditions (indefinite ceiling at 200 feet, sky obscured, visibility one quarter mile with fog, and runway visual range 3,400 feet.) [5]

The government maintains that the pilot informed the controller that he was not VFR and that the pilot told her that he had about one quarter tank of fuel remaining. Learning that Kalamazoo was not VFR, understanding that the pilot was violating 14 CFR § 91.105 and that he declined to declare an emergency, the controller declared an emergency and issued radar vectors for the aircraft to return toward the area of the Kent County Airport. The government maintains that the controller issued vectors, which the pilot had difficulty following, so that the pilot could fly over the airport in hopes of seeing the approach lights of Runway 26L. The controller told the pilot to begin descent at his discretion. The government emphasizes that as the pilot is in command of his aircraft, he had the option to descend, whenever he wished, to an altitude of his own choosing. The government denies that the maneuvers or vectors issued by the controller caused the pilot to experience spatial disorientation. Rather, the government quotes from Plaintiff's deposition that the last thing that Mr. Dyer recalled was pushing his passenger who was leaning forward interfering with flight controls back from the instrument panel. At that instant the pilot had assured his passenger that everything was all right, thus suggesting no vertigo or spatial disorientation.

Defendant denies that vectoring to Kalamazoo was a viable alternative. It asserts that the aircraft had 36 gallons of usable fuel at take-off and had been airborne for 2 hours 45 minutes at the time the pilot asked for the vector to Kalamazoo. Again relying on Plaintiff Dyer's deposition, the government expert, Richard Brantner, stated that Mr. Dyer had been pulling back on the throttle to "lean" the aircraft engine, an improper procedure which does not decrease the amount of fuel consumed. [6] In the opin-

---

5. Runway visual range is an electronic measurement of visibility made near the landing portion of the runway.

6. The government's expert is presently a flight instructor and has previously been a pilot for the Michigan State Police. He has logged more than 6,000 flight hours, 90% of which has been in Michigan. He testified that he ascertained

ion of the pilot expert, 06R was consuming 11.6 gallons per hour on this flight. Defendant claims that the pilot would have run out of fuel before reaching Kalamazoo and would have crashed before reaching the Kalamazoo Airport. Cruising at a speed of 115 mph, from the point north of the Kent County Airport where 06R was located at 0646:02Z, the government claims that the aircraft had 22.8 minutes flight time left for a 24 minute flight.

Defendant asserts that the controller had an ASR–4 video map that extended over only a 30 mile radius from the Grand Rapids Tower. The Kalamazoo Airport was approximately 15 miles beyond where the video map extended. Furthermore, the transponder on 06R was not operating properly.[7] The pilot was aware that his transponder was not operating properly as he stated at 0643:09Z. The controller and the FAA administrator argue that it would be extremely difficult for the controller to maintain contact with 06R on a flight to Kalamazoo at an altitude of 3100 feet without a properly working transponder. According to the FAA officials, the controller would be able to see 06R for 15–20 miles without the transponder.

While radar may have been able to track the plane without a transponder for 30 miles toward Kalamazoo if the pilot climbed to 6,000 feet, that distance was still 15 miles short of the airport. Furthermore, the government maintains that as the pilot had indicated that he was in IFR conditions, it would have been imprudent for the controller to direct a VFR rated pilot to climb from 3,100 to 6,000 feet in IFR conditions. Assuming that he reached Kalamazoo, the government asserts that the pilot would have had to descend from this higher altitude wasting precious fuel and time.

Defendant denies that the Chicago Center radar would have alleviated the situation as 06R did not have a working tran-

sponder and as the Chicago Center radar did not have the fine gradations of distance on the scope that a terminal radar has. Defendant states that the Kalamazoo tower could not have assisted the pilot in landing there because it lacked radar and could not have identified the plane. According to the government, it not only would have been imprudent for the controller to vector a VFR pilot 45 miles away to a non-radar equipped airport, the pilot would not have been able to maintain the directions given him. Referring to the tape, the government asserts that the pilot veered to a 360° heading rather than the 260° heading suggested by the controller at 0651:33. At 0653:00, the radar showed the aircraft tracking a heading of approximately 300–310° instead of the 280° suggested. Given Mr. Dyer's inability to follow the vectors issued, the limitations of the radar map at Grand Rapids, and the non-functional transponder, the government indicates that it is improbable that the pilot would have landed safely at Kalamazoo.

Acknowledging that there are irregularities in the log of the surface weather reports at Kalamazoo and acknowledging that no special weather observations were taken in accord with FAA procedures as visibility dropped below three miles, the government seeks to persuade the Court that Kalamazoo weather was the same as Battle Creek which was 1¼ miles visibility with fog.

The government's pilot expert testified that a pilot with Mr. Dyer's experience would have been unable to make a safe landing in heavy ground fog without radar assistance. He also stated that the pilot was not qualified to attempt a special VFR approach at night because he was not instrument rated and equipped.

Defendant states that the air traffic controller properly declared an emergency because FAR 91.105 and the Airman's Information Manual 1–21 require the pilot to

---

the amount of usable fuel by studying a 1966 owners manual for the Cessna 172 and opined that there would be no difference in the amount of usable fuel capacity for the 1965 model which was involved in the accident.

7. A transponder is a target enhancement device in an aircraft which allows radar to see the aircraft when it otherwise might not be able to do so.

maintain 1,000 feet above and 2,000 feet horizontal distance from the clouds and a minimum visibility of 3 statute miles within controlled airspace and to land only at airports where the minimum visibility is at least 3 miles. Given the weather conditions at Grand Rapids on the night in question, the presence of the aircraft meant that an emergency existed. Also, the government maintains that only by declaring an emergency could the controller *legally* assist the pilot under these circumstances. Thomas J. O'Malley, an FAA official, testified that any time there is a VFR rated pilot in IFR conditions an emergency exists.

The United States cites the following facts in support of its contention that the decision to declare that an emergency existed was appropriate for other reasons:

(1) The pilot was trying to find the airport and was returning to Grand Rapids.

(2) He asked for his location and stated that he couldn't see a thing because he ran into a cloud deck.

(3) He stated that both his radio and his transponder were all "screwy."

(4) He wanted "to get this bird down now" when asked what his intentions were.

(5) He was not instrument rated or equipped.

(6) When the controller suggested an alternative airport (Lowell), the pilot responded that he had about ¼ tank of fuel left.

(7) The air traffic controller has maintained that she could tell that the aircraft was a single engine because of the speed at which it moved on the radar scope and has testified that she thought the pilot had one hour's flight time remaining and that if a landing attempt at Kalamazoo were unsuccessful, the pilot would not be able to return to Grand Rapids.

(8) When specifically asked whether he was VFR, the pilot replied, "No, we can't see a thing, uh the clouds, uh, haven't broken since, we can't see through at all."

Both the controller and the government's pilot expert have testified that a reasonably prudent pilot would state that he was VFR on top if that were in fact the case. Further, when the controller stated that the pilot should understand he was IFR, he never disputed the statement as a reasonably prudent pilot would do, if the controller had a mistaken assumption.

The controller stated that she felt the pilot to be inexperienced and did not believe that he would have enough fuel to fly to Kalamazoo and return to Grand Rapids if he were unable to land in Kalamazoo. Additionally, the weather at Grand Rapids was improving. At 0655, the approximate time of the accident, the surface and tower visibility had increased from ¼ to ½ miles and the RVR (runway visual range) extended for a mile beyond the end of the runway.

■ The duties of the air traffic controllers are set out by the standards and procedures found in the Air Traffic Control Manual. *Hartz v. United States*, 249 F.Supp. 119 (N.D.Ga.1965). However, this standard is not the exclusive standard. *Rudelson v. United States*, 602 F.2d 1326 (CA 9 1979). In some cases, the duty of a controller goes beyond that imposed by the operating manuals of the FAA. *United v. Weiner*, 335 F.2d 379 (CA 9 1964) and *Ingham v. Eastern Airlines*, 373 F.2d 227 (CA 2 1967). Warnings beyond those prescribed by the aviation manuals must be given when the danger is immediate and extreme. *United States v. Furumizo*, 381 F.2d 965 (CA 9 1967).

■ Under Michigan state law, which applies to this action pursued under the Federal Tort Claims Act, the measure of the duty of care for a defendant charged with negligence is reasonable care under the circumstances of the case. *Massey v. Scripter*, 401 Mich. 385, 258 N.W.2d 44 (1977). *McLaughlin v. Great Lakes Contracting Company of Detroit*, 82 Mich.App. 729, 267 N.W.2d 489 (1978) holds that the standard of care which is required is that of any reasonably prudent man acting under the same or similar circumstances.

■ Standards of due care in aviation cases are concurrent, resting upon both the

airplane pilot and ground personnel; both are responsible for the safe conduct of the aircraft and for the safety of airplane passengers. *Spaulding v. United States,* 455 F.2d 222 (CA 9 1972).

 *Spaulding* also stands for the usual proposition in tort law that, in order for the Plaintiffs to recover against the government, they must prove by a preponderance of the evidence that an employee of the United States was negligent within the scope of his employment and that such negligence was a proximate cause of the crash.

 While 14 CFR § 91.3(a) provides that the pilot is in command of his aircraft, and is directly responsible for, and has the final authority for, its operation, before a pilot is held legally responsible for his aircraft, he must know those facts which are material to the operation of his plane. *Gill v. United States,* 429 F.2d 1072 (CA 5 1970). Even though the air traffic controller has the duty to warn when the controller is better qualified than the pilot to evaluate the actual situation, as in *Hartz v. United States, supra,* or when the controller is better able to gather more information or make more observations than the pilot, *Hochrein v. United States,* 238 F.Supp. 317 (E.D.Pa.1965), the duty to warn does not relieve the pilot of his primary duty and responsibility. The pilot has a continuing duty to be aware of danger when he can gather adequate information with his own eyes and instruments. A pilot cannot ignore the weather information he has been given or disregard the weather conditions he sees around him. *Somlo v. United States,* 274 F.Supp. 827 (N.D.Ill.1967) *aff'd* 416 F.2d 640 (CA 7 1969).

 Because the pilot has the final responsibility for the navigation and safety of the aircraft, except for the separation of aircraft, *Spaulding v. United States, supra,* the controller must determine the pilot's intentions. While the standard of care in an emergency situation is the same as the standard of care in other circumstances, in that the controller must act reasonably under the circumstances, the law requires a controller to exercise his best judgment in meeting situations not covered by the manual. *Ward v. United States,* 462 F.Supp. 667 (N.D.Tex.1978). *Deal v. United States,* 413 F.Supp. 630 (W.D.Ark.1976) *aff'd* 552 F.2d 255 (CA 8 1976) *cert. den.* 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 175 (1977), states that the controller has a duty to give the pilot information which he requests and that no other duty should be imposed on air traffic controllers. However, without creating an open ended duty of care requiring an air traffic controller to offer gratuitous advice on speculative hazards, the controller must provide information within her domain or which is easily acquired and which is material to the pilot's decision.

Having determined the relative duties and the standard of care to be applied in negligence cases as a matter of law, whether any such duty has been breached and whether the breach was a proximate cause of the accident are questions for the factfinder. *Federal Express Corporation v. State of Rhode Island Department of Transportation,* 664 F.2d 830 (CA 1 1981).

 I find that the negligence of Plaintiff, Luther Dyer, was a proximate cause of the airplane crash. He failed to heed an advisory against VFR cross country flight when he departed Fremont, Michigan for Fremont, Ohio during the morning of July 29. Having been specifically informed that the weather conditions were unfavorable on his flight path, the pilot reasonably should have updated his weather information before taking off on a night cross country VFR flight when navigation is more difficult. Failure to learn of the weather conditions enroute and at his intended destination, not only violates the FAR's, but must be considered contrary to basic pilot procedure. There was no emergency or inconvenience which impeded obtaining this weather information. Mr. Dyer had access to a telephone prior to departure and had had radio contact while flying over Toledo and points north. Mr. Dyer asserts that he heard other aircraft in contact with the controller and assumed the conditions in Michigan were VFR. As the harsh facts

prove, such reliance on partial information or misconstruing information intended for other aircraft does not substitute for the pilot's duty to verify the weather on route and at his destination. Had he made a simple telephone call or questioned the control tower, he could easily have learned that the relevant area of his destination was IFR. Mr. Dyer now states that he would not have left Ohio or would have landed at Jackson had he known that fact. Only he is responsible for his failure to be informed of weather conditions. This negligence, the failure to become informed, was a proximate cause of the accident and of the injuries sustained by the Plaintiffs.

Having been initially negligent in flying into adverse weather conditions, the pilot again exercised lack of good judgment by failing to contact a control tower for assistance immediately to determine where the nearest VFR landing field was located. Instead, he flew from Fremont, Michigan to Muskegon to Grand Rapids before requesting assistance. As the contentions of the parties indicate, the fuel capacity and the fuel remaining in time are matters of dispute. At the very least, Plaintiff diminished his margin for error by failing to obtain relevant and necessary information promptly. If the pilot were experienced and were instrument rated and equipped, perhaps his confidence may have been justified. However, Plaintiff must be charged with the knowledge of his own limitations. He certainly was aware early in his flight that his radio and transponder were faulty. All of these conditions should have warned a reasonably prudent pilot to seek assistance when he first lost contact with the ground rather than to find alternatives on his own.

If the aircraft were in fact flying VFR above the cloud deck as Plaintiff Dyer now claims, he did not communicate this fact to the controller. At 0649:28 the controller asked 06R if he were VFR *at the present time.* The response was initially garbled, but continued "but we can't see a thing because of these clouds, we're still holding the sixty degree heading you gave us." The controller told the pilot to fly his own headings and then stated the assumption that the pilot now wants the Court to make at 0649:44: "You said you were VFR right now?" At 0649:47, the pilot replied, "Uh, no, we can't see a thing, uh, the clouds, uh, haven't broken since, we can't see through at all." This statement, by itself, *negates* the inference that the pilot was VFR on top. However, at 0649:57, the controller stated: "O.K. Understand you're in IFR conditions then, I'll, uh, declare an emergency for you. Turn back right to a heading of two six zero, I'll bring you into the Grand Rapids airport."

 If the controller were in fact negligent in assuming that the pilot was IFR rather than VFR on top as Plaintiff's expert McDermott asserts, the pilot was also negligent in allowing her to continue to make that assumption when she specifically told him what she understood.

If it constituted negligence to bring the aircraft from IFR conditions to VFR conditions, failure to correct the premise on which the following instructions were based was also negligent and a proximate cause of the accident.

When the controller asked the pilot if he were familiar at all with IFR procedures, he replied that he was "a little bit" familiar. At that time, 0651:33, the controller told the pilot that he was not following the heading she had given him. At 0652:20, having determined that the plane's altitude was 3,100 feet and that it was 5 miles from the Grand Rapids airport, the controller told the pilot that he could begin descent at his own discretion. While the pilot now argues that he considered that this was an instruction to descend, he never questioned the statement or indicated that he didn't wish to comply with it or was unable to do so. At this point, if the descent would have placed him in IFR conditions, he had the duty to so inform the controller. Failing to do this, he violated AIM 1–31, 1–33, 1–34, 1–79, and FAR 91.105. At 0652:30 the controller stated that she was going to take the aircraft right over the top of Grand Rapids airport, just to the north side of it, stating that he could begin descent and let her know if he picked up the runway lights.

Although it appears from the transcript that the pilot had completed all turns prior to being informed that he could begin descent at his discretion, the parties disagree about the nature of the type of approach that was attempted here. Plaintiff's expert contends that the pilot's discretion ended when the controller declared an emergency for him and that she improperly attempted a radar surveillance approach and that she failed to give him the minimum descent altitudes required in surveillance approaches. The controller has testified that she did not intend to give Plaintiff a surveillance approach as he was not instrument rated or equipped and that minimum descent altitudes were not warranted when a surveillance approach was not used. The controller asserts that she was merely giving the pilot radar vectors over the airport in the hope that the pilot would see the runway lights.

■ Taken literally, that appears to be what she was doing. That procedure, according to the experts, is often used in the hopes that the pilot will find a "hole" in the clouds and be able to land. Assuming that the duty of the controller involves more than adherence to the air traffic controller's manual, however, the question remains whether the controller reasonably should have provided more assistance to the pilot. If so, and such a failure was a proximate cause of the injuries and damages to the Plaintiffs, the government is liable under a comparative negligence theory.

Plaintiff's expert has emphasized that the controller did not sufficiently develop the information upon which she based her decisions. He has claimed that she should have requested other information in order to determine whether the pilot was indeed VFR, by asking "Are you in the clear?" He claims that she should have determined more precisely the instrument capability of the pilot and the fuel capacity of the plane. He also states that while an instrument or air surveillance approach for a VFR rated and equipped pilot has happened and that there are safe (or "saved") landings, this approach should be used as a last resort and

the controller should fully explain what she is doing. Plaintiffs argue that even if the controller were only giving radar vectors to the pilot in hopes that he could see the runway and make a safe landing, she should have told him the contingent plans if such an attempt failed so that he would not be misled by the directions.

Of course, it is difficult in retrospect to determine the better part of wisdom when a controller is dealing with an inexperienced pilot. If she operates on the theory that more information is better and fully explains alternatives and procedures, she may confuse or frighten the novice in an emergency. For a particular individual, the better course may be to tell him specifically what she is going to do (being aware that in order to obtain a VFR license the pilot is charged with some minimal base of information) and dealing with the alternatives as needed. On the other hand, a full explanation of contingencies and the reason an alternative is suggested may reassure the nervous pilot in a precipitous situation.

■ Although I believe that the pilot affirmatively misled the controller, leading her to believe that he was low on fuel and wanted to land immediately as well as being in IFR conditions, I also believe that it would have been prudent for the controller to have elicited more information from the pilot in order to give adequate assistance. While the response that the pilot had "about a quarter of a tank" of fuel might conservatively be interpreted to be less than a quarter of a tank, she should have developed this information before giving up on alternatives in light of the obvious danger of his landing at Grand Rapids. The government's present theory of the fuel remaining in time differs from the controller's assumption at the time. Similarly, while she may have assumed that she was merely giving him radar vectors rather than an instrument approach, the transcript is ambiguous because the controller never followed up on her question when the pilot stated that he was a "little bit" familiar with IFR procedures. As the pilot is charged with creating false assumptions, if

indeed they were false, the controller must similarly be accountable for not clearly indicating to the pilot exactly what she was going to do, or not do, to assist his approach and what was expected from him. If she were not going to provide a radar assisted approach, she should have specifically negated the possibility in his mind since she created such a possibility by asking about his familiarity with IFR procedures and remaining silent when she received an imprecise response. Her mental decision as to the appropriate action, given his response, may reasonably not have been similar to his expectations. The prudent controller should not allow this divergence.

■ At 0645:44, the pilot asked the controller how far south he had to go to be VFR. I find that the government was negligent in failing to record, properly, the weather conditions in Kalamazoo and that this negligence was a proximate cause of the accident. After initially reporting that it was clear, at 0646:53, the Kalamazoo controller called to say that the weather was "getting down" and he was going to call it two miles. In the first place, if the weather in Kalamazoo had been recorded properly, the Grand Rapids controller would not have initially assumed that Kalamazoo was VFR, and prudently would have determined the nearest VFR airport earlier. Secondly, she never did give a direct response to the pilot's request to know how far south he had to go. Thirdly, she did not tell him the exact weather conditions at Kalamazoo, and the differences between Kalamazoo and Grand Rapids. If, indeed, the pilot remains ultimately responsible for the safe operation of his aircraft as the government contends here, he must be given sufficient information to make his own determination. In this instance, that would involve divulging that Kalamazoo was not radar equipped, that the weather was two miles and getting worse, and that Grand Rapids radar scope could not assist him in making the landing as the map did not extend far enough, and the expected flight time, or distance, to Kalamazoo. While it may indeed have been imprudent to direct the pilot to Kalamazoo, it is reasonable to give

him the information he needed to make that determination for himself, and for him to decide which risks he chose to assume. The government asserts that the aircraft would not have landed safely at any rate because it would have run out of fuel. Although I am tempted to believe that the government's expert is correct, and that the plane had 36 gallons of usable fuel, as the 1966 owner's manual indicated, and that the pilot did not use proper "leaning" techniques, that temptation does not alter the outcome as I cannot find by a preponderance of the evidence that this is so. The pilot has contended that the plane had a capacity of 42 gallons and that he had 39 gallons of usable fuel. As there was no record introduced on the fuel capacity of this *particular* plane, other than the pilot's testimony, I am not persuaded that there was no variance from the later model. I also cannot assume by a preponderance of the evidence that the pilot would have consumed fuel at the same rate on the flight from Grand Rapids to Kalamazoo and that he burned from the time of his departure. The controller did not discover exactly how much fuel in time the pilot thought he had. As the pilot is not now credited with interpretations he seeks to make after the fact when he did not create similar impressions at the time for decision, the government cannot succeed here. There is no showing that the controller would not have directed the pilot to Kalamazoo if it were VFR. Flight emergencies exist for many reasons. Weather is only one of them. If the pilot were running low on fuel, or thought he was, the controller had the duty to discover this fact in detail as the manuals indicate.

■ Plaintiff Dyer states that the doctrine of subsequent negligence indicates that comparative negligence is inapplicable to this case as expressed by Justice Williams in *Kirby v. Larson,* 400 Mich. 585, 256 N.W.2d 400 (1977). While Plaintiff admits that no appellate court has reconsidered this doctrine after the adoption of comparative negligence in *Placek v. Sterling Heights,* 405 Mich. 638, 275 N.W.2d 511 (1979), he asserts that there is a preference

to continue this in the standard jury instructions and in appellate decisions involving safety devices in the work place. While I believe that the Michigan Supreme Court has recently negated the second contention in *Hardy v. Monsanto,* 414 Mich. 29, 323 N.W.2d 270 (1982), I find the theory of subsequent negligence inapplicable here. Plaintiff Dyer did more than merely precipitate a hazardous situation. He continued to mislead the controller by his failure to object to her instructions, or to inform her if he felt that her assumptions were false or directions unwise for him to carry out. Furthermore, I find that by his own statements, he was negligent in taking his hands off the controls to push the passenger back during the landing. Aside from being inconsistent with his contention that he was spatially disoriented, it is inconsistent with his contention that the controller should have discovered whether there was a passenger to help look out the windows. Apparently, that was exactly what the passenger was doing, (looking for the runway) to the pilot's distraction. The reasonably prudent action would have been to communicate verbally with the passenger rather than physically at that critical stage of the approach.

■ The government likewise contends that because the Plaintiff negligently created the emergency, and acted negligently in failing to inform the controller properly of his straits, there was an intervening and superseding cause of the accident. As the primary duty of the air traffic controller is to assist pilots in distress, whether caused by their own negligence or not, and as the failure to inform the pilot of his options and to respond to his direct request can fairly be said to have been a proximate cause of his failure to land successfully, I find that the negligence of the parties is concurrent and that comparative negligence applies. Furthermore, I assess the negligence of the pilot, Luther Dyer, to be 80% of the total negligence, and the negligence of the air traffic controllers in Kalamazoo and Grand Rapids to be 20%. Their negligence is charged to the government. 28 U.S.C. § 1346.

Consequently, any damages awarded to Plaintiff Dyer will be reduced accordingly.

Plaintiff Williams contends that the nonnegligent Plaintiff should not have damages reduced even though comparative negligence applies to tortfeasors. The government has not charged the passenger, Rodney Williams, with any negligence.

M.S.A. § 27a.2925(2) [M.C.L.A. § 600.-2925b] reads:

In determining the pro rata shares of Tort-Feasors in the entire liability as between themselves only and without affecting the rights of the injured party to a joint and several judgment:

(a) Their relative degrees of fault shall be considered.

■ In this regard, the present law in Michigan is that a plaintiff who is himself free from fault is not to have his full damages reduced by the comparative negligence of a co-employee, employer, unnamed defendant, or anyone else. *Conkright v. Ballantyne of Omaha, Inc.,* 496 F.Supp. 147 (W.D.Mich.1980); *Jorae v. Clinton Crop Service,* 465 F.Supp. 952 (E.D.Mich.1979). *See, Johnston v. Billot,* 109 Mich.App. 578, 311 N.W.2d 808 (1981).

Having found that a cause of action exists, and assessed the negligence of the parties, I must now determine Plaintiffs' damages. In awarding damages in a suit filed under the Federal Tort Claims Act, the Court must apply Michigan law in determining the rate of inflation to be used in calculating the award and the rate to be discounted to obtain the present value of an amount of money received as a lump sum award rather than in annual installments. Based upon my analysis of the case law in Michigan, I conclude that these factors offset each other. *See, Draisma v. United States,* 492 F.Supp. 1317 (W.D.Mich.1980).

### Plaintiff Luther Dyer

■ Plaintiff was 26 years old at the time of the accident. His life expectancy is found to be 44.9 years as of that date. M.C.L.A. § 500.834; M.S.A. § 24.1834. He

sustained multiple bruises and lacerations, a fractured jaw, avulsed teeth, and a fractured foot as a result of the airplane crash. He was hospitalized for 7 days and was unable to return to work for approximately 6 weeks. During this period, Plaintiff's jaws were wired shut and there was a cast on his right foot.

Plaintiff Dyer states that he is left with a number of residual effects as a consequence of his injuries. He states that he has recurring pain in his left ankle when he runs or stands after periods of rest, suffers cramps in both legs when lying down, and has difficulty sleeping. He also states that the gums around his avulsed teeth are deteriorating and that future periodontal work or restoration will be required. He claims that he had numbness around the hands and feet for approximately one year after the accident and that he continues to have numbness around the mouth and lip area.

■ Additionally, Plaintiff's wife, Sharon Dyer, sues for loss of consortium. She administered to her husband's needs during his recovery and alleges that because of her husband's continuing discomfort she also has had to endure emotional strain. Michigan allows recovery for the loss of the aid and society of a spouse caused by tortious conduct of another.

The parties have stipulated that medical and dental bills for treatment to Luther Dyer amount to $4,932.91. Thus, Mr. Dyer's damages for lost wages which averaged $215.44 per week for a period of six weeks and medical expenses total $6,225.55.

■ Obviously, Plaintiff Dyer has experienced pain and suffering. This is really a generic term for several types of damages including mental and physical pain and suffering for which no monetary figure is easily ascertainable. Damages for future pain and suffering, including mental suffering, are recoverable where shown to be reasonably probable. *Gowdy v. United States,* 271 F.Supp. 733 (W.D.Mich.1967). I find, that while Plaintiff experiences some residuals from his injuries which may reasonably be expected to continue, they are less intense

than they were initially following the accident. During the course of the trial, I observed that Plaintiff did not appear to be in great pain or to be greatly disfigured, and have noted that he has returned to gainful employment.

For the year following the accident, from July 29, 1977 through July, 1978, when Plaintiff's physical and mental pain and suffering were most intense, and when he was undergoing dental repairs, I award $1,000 per month, or *$12,000.*

After the first year, Plaintiff's own statements indicate that his discomfort has decreased substantially. Although he states that he has difficulty sleeping and that his injuries limit his activities, he has recovered comparatively well. For this residual pain and suffering, both mental and physical, I award *$500* per year for life, or for 43.9 years, for a total of *$21,950.*

■ One who sustains an injury as a result of the wrongful conduct of a tortfeasor is entitled to compensation for the loss of physical power, vitality, and enjoyment of life. *Gowdy v. United States, supra.* Plaintiff continues to have numbness around his mouth and continues to require dental repair as a consequence of his facial injuries. As this injury affects his ability to enjoy the food he eats, his physical appearance, and his sensory perceptions, I award $200 per year for this loss of enjoyment of life for 43.9 years for a total of *$8,780.*

I award Sharon Dyer *$1,000* for her loss of consortium during the period that her husband was hospitalized and recovering from his injuries.

As previously indicated, these damages are to be reduced by the extent of Luther Dyer's negligence, or by 80%.

### Damages Caused by the Death of Rodney Williams

Rodney Williams had a life expectancy of 34.88 years and a work life expectancy of 24.88 years at the time of his death. He had four dependents at the time of the accident.

Rodney Williams' wife, Joyce Marie Williams had a life expectancy of 39.82 years; the Williams' eldest child, Ellen, a deaf-mute, had a life expectancy of 45.95 years; their son, Timothy, had a date of maturity as of April 9, 1982; and their youngest child, Robin, has an expected date of maturity of December 16, 1986.

The Williams family has used the services of an economist, John P. Henderson, of Lansing, Michigan, in determining the economic loss caused by Rodney Williams' death. I accept the calculations of Plaintiff's expert regarding decedent's earning capacity as being well founded upon his employment history and the reasonable expectation that such earnings would continue.

Thus, Rodney Williams' earning capacity from 1977.58 to 1982.44, the trial date, net of personal consumption would have been $52,596.26. His earning capacity from the date of trial to the end of his worklife expectancy, net of personal consumption, would have been $344,967.31. Additionally, Rodney Williams had fringe benefits which were valued at 10% of his annual salary. The value of these fringe benefits from the date of the accident until the date of trial amount to $5,259.63 and $34,497.00 from trial to the end of his worklife expectancy.

Rodney Williams was a family man who spent his leisure time with his family. His wife had been married to him since she was fifteen years old. The evidence shows that Rodney Williams was particularly handy in making household repairs, and, in fact, largely built the family home. He was involved with his children and was teaching his son, Timothy, manual skills such as carpentry and plumbing at the time of his death. The evidence also shows that Rodney Williams was particularly important to his daughter, Ellen, as her ability to communicate with the outside world is severely limited. The record similarly demonstrates that her father's death was a trauma to his youngest daughter. She did not do well in school in the year following her father's accident and was required to repeat a grade in school.

### Joyce Williams

■ Joyce Marie Williams, Rodney Williams' widow, is entitled to economic and non-economic losses. The Michigan Supreme Court in *Wood v. Detroit Edison Company,* 409 Mich. 279, 294 N.W.2d 571 (1980) has stated that the fact that a widow has remarried is irrelevant to mitigate damages in wrongful death actions.

■ I find that based upon Rodney Williams' earning capacity, his widow, individually and as natural guardian of her three children, is entitled to *$437,319.93* for economic loss, past, present, and future. (One-third of this economic loss is to be placed in trust for the Williams' disabled daughter, Ellen, as discussed *infra.*)

Additionally, Rodney Williams' widow is entitled to *$2,905.35* for funeral expenses and the ambulance bill.

His widow is further entitled to non-economic loss, as follows, for the trauma and problems associated with Rodney Williams' death which requires her to rear her three children without the comfort and assistance of her husband: *$25,000* for the first year following the death of Rodney Williams, and *$10,000* per year for the following four years for a total of *$40,000* until the date of trial. Joyce Williams is further awarded *$50,000* for the future loss of the comfort and companionship of her husband.

### Ellen Williams

Because Ellen Williams is disabled, she would be entitled to receive part of the economic loss sustained by the death of her father, which has previously been assigned to her mother. The Court determines that one-third of this economic loss be segregated and placed in a special account for Ellen Williams which must be approved by the Court as to creation and control.

■ Ellen Williams' non-economic loss from the date of the accident until the date of the trial is *$25,000* and is likewise to be placed in trust.

Her future non-economic loss is great because of her physical and mental deficiencies and her dependence on Rodney Williams. The Court awards *$100,000* for this loss.

### Timothy Williams

Timothy Williams' loss to date is *$50,000* in recognition of the fact that he was 13 years old at the time of his father's death and was closely attached to his father and has been denied the benefit of his father's guidance during his formative years.

His future loss is less than Ellen's in recognition of the fact that Timothy will likely marry and leave the family home. This future loss is found to be *$25,000*.

### Robin Williams

Robin Williams will not reach her age of majority until December, 1986. She is therefore awarded *$25,000* for the period until trial, and *$20,000* for the interim until her majority. She is also awarded *$25,000* for the future loss of the association and companionship of her father.

DAMAGES SUMMARY

LUTHER DYER

| | |
|---|---|
| MEDICAL EXPENSES AND EARNINGS LOSS | $6,225.55 |
| PAIN AND SUFFERING ($1,000 per month from July 29, 1977 through July, 1980, for a total of $12,000. For remaining 43.9 years of Plaintiff's life expectancy, $500 per year for a total of $21,950.) | 33,950.00 |
| LOSS OF ENJOYMENT OF LIFE ($200 per year for period commencing one year after injury when optimal recovery reached for 43.9 years for a total of $8,780.) | 8,780.00 |
| LOSS OF CONSORTIUM – SHARON DYER | 1,000.00 |
| TOTAL DAMAGES | $49,955.55 |

These damages are to be reduced by Plaintiffs Dyer's negligence or 80%.

JOYCE WILLIAMS

| | | |
|---|---|---|
| ECONOMIC LOSS: | | |
| LOST EARNINGS OF RODNEY WILLIAMS (net of personal consumption from date of accident until date of trial $52,596.26.) | | $52,596.26 |
| EARNING CAPACITY OF RODNEY WILLIAMS (net of personal consumption from trial date until end of worklife expectancy) | | 344,967.31 |
| FRINGE BENEFITS (based on 10% of annual salary $5,259.63 from date of accident until time of trial, and $34,496.73 from time of trial to the end of Rodney Williams' worklife expectancy.) | | 39,756.36 |
| FUNERAL EXPENSES AND AMBULANCE BILL | | 2,905.35 |
| TOTAL ECONOMIC LOSS ($145,776.64 to be placed in trust for Ellen Williams.) | | $440,225.28 |
| NON–ECONOMIC LOSS: | | |
| From July 29, 1977 through July, 1978 | $25,000 | |
| From 1978 through June, 1982 $10,000 per year | 40,000 | |
| Future non-economic loss | 50,000 | 115,000.00 |
| TOTAL LOSS | | $555,225.28 |

ELLEN WILLIAMS

ECONOMIC LOSS
One-third of Rodney Williams lost earnings, earnings capacity and fringe benefits or one-third of $437,329.93 is to be placed in trust for Ellen Williams. This amount ($145,776.64) has been included in Joyce Williams' award.

NON–ECONOMIC LOSS

| | | |
|---|---|---|
| From the date of accident until the date of trial (to be placed in trust) | $25,000 | |
| Future non-economic loss | 100,000 | |
| ELLEN'S TOTAL LOSS | | $125,000.00 |

TIMOTHY WILLIAMS

NON–ECONOMIC LOSS

| | | |
|---|---|---|
| From date of accident until date of maturity | $50,000 | |
| From date of maturity until date of trial and future non-economic loss | 25,000 | |
| TIMOTHY'S TOTAL LOSS | | $75,000.00 |

ROBIN WILLIAMS

NON–ECONOMIC LOSS

| | | |
|---|---|---|
| From date of accident until date of trial | $25,000 | |
| From date of trial until date of maturity | 20,000 | |
| Future non-economic loss | 25,000 | |
| ROBIN'S TOTAL LOSS | | $70,000.00 |
| TOTAL LOSSES FOR WILLIAMS' PLAINTIFFS | | $825,225.28 |

JUDGMENT ORDER

In accordance with the attached Opinion, dated November 18, 1982;

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiffs Luther and Sharon Dyer be awarded 20% of their actual damages of $49,955.55 or $9,911.11.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiffs Joyce Williams, on behalf of herself and as Administratrix of the Estate of Rodney Williams be awarded the sum of $825,235.28 to be distributed pursuant to the attached Opinion.

ATTACHMENT A

TRANSCRIPT

GRAND RAPIDS AIRPORT CONTROL TOWER

JULY 30, 1977

0634 – 0658 GMT

LEGEND:
06R Cessna 5606 Romeo
GRR Grand Rapids Control Tower
AZO Kalamazoo Control Tower
CHI Chicago ARTC Center

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0634:20 | | (start of transcript) |
| 0641:09 | 06R | GRAND RAPIDS TOWER, CESSNA FIVE SIX ZERO SIX ROMEO, OVER |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0641:31 | GRR | ZERO SIX ROMEO, GO AHEAD· |
| | 06R | YEAH, UH, KENT COUNTY TOWER, UH, WE'RE UNABLE TO FIND FREMONT ON OUR CHARTS, I'M NOW SOUTHEAST BOUND ON MAGNETIC HEADING OF ONE THREE FIVE, UH, TRYING TO FIND KENT COUNTY AIRPORT, UH, GIVE ME SOME HELP, SQUAWK, SQUAWK COMING THROUGH TO YOU |
| 0641:59 | GRR | ZERO SIX ROMEO, UNDERSTAND YOU COULD NOT FIND FREMONT, UH, THE LAST PART OF THAT WAS GARBLED, SAY AGAIN |
| | 06R | RIGHT, I CANNOT FIND FREMONT, BUT I'M RETURNING TO GRAND RAPIDS, UH, AIRPORT, UH, COULD YOU GIVE ME THE CURRENT WEATHER CONDITIONS PLEASE? |
| | GRR | LATEST WEATHER IS INDEFINITE CEILING TWO HUNDRED, SKY OBSCURED, VISIBILITY ONE QUARTER OF A MILE WITH FOG, RUNWAY TWO SIX LEFT VISUAL RANGE IS THREE THOUSAND FOUR HUNDRED |
| 0642:43 | 06R | KENT COUNTY TOWER, CESSNA ZERO SIX ROMEO, OVER |
| 0642:49 | GRR | GO AHEAD |
| 0642:50 | 06R | IF I SQUAWK THE NUMBERS, SEE IF YOU CAN GIVE ME AN EXACT LOCATION |
| 0643:02 | GRR | 'K, I DIDN'T UNDERSTAND THAT ZERO SIX ROMEO, SAY AGAIN |
| 0643:06 | 06R | ROGER, I JUST RAN INTO THIS CLOUD DECK WHEN I WAS GOING NORTH, BUT I TURNED AROUND, CAN YOU HELP ME TURN THIS DAMN AIRPLANE CAUSE I CAN'T SEE A THING BECAUSE OF THE CLOUDS, UH, CAN I SQUAWK THE NUMBERS AND MAYBE YOU CAN HELP PINPOINT MY EXACT LOCATION? |
| | GRR | 'K, SQUAWK V F R AND IDENT |
| 0643:45 | GRR | ZERO SIX ROMEO, DO YOU HAVE ANY IDEA HOW FAR NORTH OF GRAND RAPIDS YOU ARE? |
| 0643:49 | 06R | I'M JUST BY THE GRAND RAPIDS AREA, UH, PROBABLY ON, UH, UH, MAYBE JUST SOUTH OF GRAND RAPIDS |
| | GRR | OK, DO YOU HAVE A TRANSPONDER? |
| | 06R | AFFIRMATIVE, BUT BOTH MY RADIO AND THE TRANSPONDER ARE ALL SCREWY, SO, UH, DON'T KNOW IF IT'S GOING TO WORK, BUT WE'LL GIVE IT A TRY |
| 0644:08 | GRR | 'K, UH, WHAT'S YOUR HEADING NOW? |
| 0644:12 | 06R | MAGNETIC HEADING OF ONE ONE FIVE |
| 0644:21 | GRR | OK, IF, UH, IF YOU CAN, TURN LEFT TO ZERO SIX ZERO FOR RADAR IDENTIFICATION |
| 0645:15 | GRR | ZERO SIX ROMEO, YOU'RE IN RADAR CONTACT, YOU'RE, UH, HALF MILE NORTH OF THE GRAND RAPIDS AIRPORT, AND SAY YOUR INTENTIONS |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0645:23 | 06R | WELL, UH, WE BETTER GET THIS BIRD DOWN NOW |
| 0645:30 | GRR | 'K, YOU INSTRUMENT RATED AND EQUIPPED? |
| 0645:32 | 06R | NEGATORY |
| 0645:37 | GRR | OK, YOU'RE WELL INSIDE THE CONTROL ZONE AT THIS TIME, AND I'M UNABLE TO, UH, ISSUE LANDING CLEARANCE UNLESS YOU DECLARE AN EMERGENCY |
| 0645:44 | 06R | NEGATORY, I JUST HIT THIS CLOUD, UH, GOING NORTH, HOW FAR SOUTH DO YOU RECKON I'LL GO BEFORE I GET BACK OUT OF IT? |
| 0645:58 | GRR | I'M NOT REAL SURE, I BELIEVE KALAMAZOO IS V F R AT THE PRESENT TIME |
| 0646:02 | 06R | UH, TEN FOUR, UH, GIVE ME A HEADING FROM MY PRESENT POSITION FOR KALAMAZOO AIRPORT |
| 0646:10 | GRR | STANDBY AND LET ME CHECK ON THAT WEATHER |
| 0646:16 | GRR | KALAMAZOO, RAPIDS, FIFTYFOUR |
| | AZO | KAZOO |
| | GRR | YEAH, YOU STILL V F R? |
| | AZO | YEAH |
| | GRR | OK, THANK YOU |
| 0646:25 | AZO | OK |
| 0646:32 | GRR | MUSKEGON, RAPIDS, NINETEEN |
| 0646:37 | AZO | AND, RAPIDS, KAZOO, ON THE FIFTYFOUR |
| | GRR | YEAH |
| 0646:40 | AZO | YEAH, TAKING LOOK AROUND, WE'RE GETTING DOWN HERE, I'M GOING TO CALL IT ABOUT TWO MILES |
| | GRR | OK |
| | AZO | OK |
| | GRR | MUSKEGON, RAPIDS, NINETEEN |
| 0646:53 | GRR | ZERO SIX ROMEO, KALAMAZOO IS ALSO I F R AT THIS TIME, LET ME CHECK WITH MUSKEGON |
| 0647:55 | GRR | ZERO SIX ROMEO, KALAMAZOO AND MUSKEGON IS, UH, ARE BOTH I F R, ARE YOU FAMILIAR WITH THE LOWELL OR IONIA AIRPORTS? |
| 0648:04 | 06R | UH, JUST BY, JUST FLYING OVER IT, BUT, UH, NOT FAMILIAR WITH IT, I KNOW IT'S JUST, UH, EAST OF, UH, GRAND RAPIDS |
| 0648:14 | GRR | OK, CONTINUE ON THE HEADING YOU'RE IN, OR ON, AND, UH, SEE IF I CAN'T GET YOU OVER TO LOWELL |
| 0648:20 | 06R | TEN FOUR, UH, I'VE GOT ABOUT A QUARTER TANK OF FUEL LEFT |
| 0649:28 | GRR | ZERO SIX ROMEO, ARE YOU V F R AT THE PRESENT TIME? |
| 0649:32 | 06R | (GARBLE) BUT WE CAN'T SEE A THING BECAUSE OF THESE CLOUDS, WE'RE STILL HOLDING THE SIXTY DEGREE HEADING YOU GAVE US |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0649:39 | GRR | FLY YOUR OWN HEADINGS THEN, AND, UH |
| 0649:44 | GRR | YOU SAID YOU ARE V F R RIGHT NOW? |
| 0649:47 | 06R | UH, NO, WE CAN'T SEE A THING, UH, THE CLOUDS, UH, HAVEN'T BROKEN SINCE, WE CAN'T SEE THROUGH AT ALL |
| 0649:57 | GRR | OK, UNDERSTAND YOU'RE IN I F R CONDITIONS THEN, I'LL, UH, DECLARE AN EMERGENCY FOR YOU, TURN BACK RIGHT TO A HEADING OF TWO SIX ZERO, I'LL BRING YOU INTO THE GRAND RAPIDS AIRPORT |
| 0650:08 | 06R | ALRIGHT, TWO SIX ZERO, ROGER |
| 0651:24 | GRR | ZERO SIX ROMEO, ARE YOU FAMILIAR AT ALL WITH I F R PROCEDURES? |
| 0651:29 | 06R | UH, LITTLE BIT |
| 0651:33 | GRR | 'K, TURN LEFT NOW, I BELIEVE YOU'RE TURNING TO A THREE SIXTY HEADING, I WANTED YOU ON A TWO SIXTY HEADING, TURN LEFT HEADING OF TWO EIGHTY |
| 0651:43 | 06R | WE SHOW TWO EIGHT ZERO RIGHT NOW |
| 0652:14 | GRR | ZERO SIX ROMEO, WHAT IS YOUR ALTITUDE? |
| 0652:17 | 06R | UH, THIRTYONE HUNDRED FEET, OVER |
| 0652:20 | GRR | OK, YOU'RE FIVE MILES FROM THE GRAND RAPIDS AIRPORT YOU CAN BEGIN DESCENT AT YOUR DISCRETION |
| 0652:27 | 06R | WE CAN BEGIN DESCENT AT MY DISCRETION, ROGER |
| 0652:30 | GRR | 'K, I'M GOING TO TAKE YOU RIGHT OVER THE TOP OF GRAND RAPIDS AIRPORT, JUST TO THE NORTH SIDE OF IT, YOU CAN BEGIN DESCENT AND LET ME KNOW IF YOU PICK UP THE RUNWAY LIGHTS |
| 0653:00 | GRR | ZERO SIX ROMEO, TURN LEFT TO ONE EIGHT ZERO, THAT'LL PUT YOU TWO MILES NORTHEAST OF THE AIRPORT |
| 0654:14 | GRR | ZERO SIX ROMEO, TURN RIGHT, HEADING TWO SIX ZERO |
| 0654:19 | ? | (microphone click) |
| 0654:42 | GRR | ZERO SIX ROMEO, YOU'RE A MILE AND A HALF FROM THE AIRPORT, ON FINAL FOR TWENTYSIX LEFT, THE STROBES ARE UP, THE APPROACH LIGHTS ARE UP, LET ME KNOW IF YOU SEE US |
| 0655:27 | GRR | ZERO SIX ROMEO, YOU SHOULD BE OVER THE RUNWAY NOW, DO YOU, UH, HAVE THE BEACON IN SIGHT? |
| 0655:51 | GRR | ZERO SIX ROMEO, GRAND RAPIDS |
| 0656:04 | GRR | ZERO SIX ROMEO, GRAND RAPIDS |
| 0656:22 | GRR | CESSNA ZERO SIX ROMEO, GRAND RAPIDS |
| 0656:52 | GRR | ZERO SIX ROMEO, GRAND RAPIDS |
| 0657:18 | GRR | ZERO SIX ROMEO, GRAND RAPIDS |

| TIME (GMT) | IDENT | TRANSMISSION |
|---|---|---|
| 0657:24 | CHI | MUSKEGON APPROACH, CHICAGO |
| 0657:37 | GRR | S ONE, GROUND |
| 0658:00 | | (end of transcript) |