Janice K. SCHULER, Co–Personal Representative of the Estate of Charles F. Schuler, Deceased, Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

Ethelyn M. WILSON, Personal Representative of the Estate of Richard J. Wilson, Deceased, Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

Nos. G84–99 CA6, G84–382 CA6.

United States District Court, W.D. Michigan, S.D.

Sept. 21, 1987.

Richard K. Willard, Asst. Atty. Gen., John A. Smietanka, U.S. Atty., Dennis F. Carroll, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for U.S.; James S. Dillman, Asst. Chief Counsel by Jerome P. Jones, Litigation Div., F.A.A., U.S. Dept. of Transp., Washington, D.C., of counsel.

Sullivan, Ward & Bone, P.C. by Richard G. Ward, Detroit, Mich., for Teledyne Continental Motors Aircraft Prod. Div.

Zamplas, Paskin, Nagi, Baxter, Johnson & Walker, by David R. Baxter, Detroit, Mich., Bronson, Bronson & McKinnon, by Bonnie Cohen, Edwin Green (co-counsel), San Francisco, Cal., John A. Smietanka (co-counsel), by Edith A. Landman, Asst. U.S. Atty., Grand Rapids, Mich., for Cessna Aircraft.

Schaden & Heldman by Kathleen O'Brien, Birmingham, Mich., and Harry J. Knudsen (co-counsel), Muskegon, Mich., for plaintiffs.

## OPINION

BENJAMIN F. GIBSON, District Judge.

This action was filed by the estates of decedents Richard Wilson ("Wilson") and Charles Schuler ("Schuler") alleging that the United States of America ("United States" *or* "Government") and other named defendants negligently caused the deaths of Wilson and Schuler. A bifurcated, com-

bined jury and nonjury trial of this matter took place from November 6 to December 17, 1986. In an opinion delivered from the bench, the Court found the defendant United States, acting through its agents, Federal Aviation Administration air traffic controllers, twenty per cent (20%) negligent with respect to the airplane crash. The Court further found that such negligence was a proximate cause of the deaths of Schuler and Wilson. The Court also found that decedent Wilson, owner and pilot of the plane, was eighty per cent (80%) negligent with respect to the crash and that such negligence was a proximate cause of the deaths of Schuler and Wilson. The remaining defendants, Cessna Aircraft Company ("Cessna"), Teledyne Industries, Incorporated ("Teledyne"), and The Garrett Corporation ("Garrett"), entered into settlement agreements with plaintiffs prior to a determination of liability and were dismissed from the lawsuit per stipulation.[1]

After the issue of liability was resolved and the jury excused, evidence was offered and argument heard on the issue of damages. Subsequently, post-trial briefs were filed on the matter, additional evidence was admitted to the record by leave of the Court and upon stipulation of the parties, and a post-trial hearing was held at which time final argument on the damages issue was heard. After reviewing the briefs presented, relevant argument of counsel as well as pertinent testamentary and documentary evidence in the record, the Court is now prepared to make a ruling. This Opinion shall constitute the Court's Findings of Fact and Conclusions of Law on the issue of damages, pursuant to Federal Rule of Civil Procedure 52(a).

## I. FINDINGS OF FACT

The following constitutes the Court's general findings of fact relevant to the issue of damages. More specific factual findings pertinent to the various legal issues presented are incorporated in the Court's discussion of its Conclusions of Law.

Charles Schuler and Richard Wilson were killed when a federally registered Cessna Model 401 aircraft crashed in the vicinity of the Muskegon County Airport on June 30, 1981. The aircraft was owned and operated by Richard Wilson. Schuler was a paying passenger in the aircraft with no responsibility for the crash which occurred.

Janice Schuler, decedent Schuler's widow, is the co-personal representative of the estate of the deceased. In addition to his widow, Schuler is survived by two children. Charles Schuler, III, decedent's son, was 18 at the time of his father's demise and was away from home attending college. Kathryn Schuler, decedent's daughter, was 15 at the time of her father's death and living at home with her parents. Both children were dependent on their father for financial support.

Ethelyn Wilson, decedent Wilson's widow, is the personal representative of the Wilson estate. In addition to his widow, Wilson is survived by five adult children. Decedent Wilson was the father of four sons, Alan, Robert, Thomas and David Wilson. Their respective ages were 35, 34, 27, and 23 at the time of Wilson's demise. Wilson was also survived by one daughter, Debra Wilson, who was 21 years of age at the time of her father's death. None of the Wilson children resided at home. None of the children was dependent upon their father for financial support.

## II. CONCLUSIONS OF LAW

In deciding the issue of damages, there are several legal issues which should

1. The following is a summary of the amounts received by plaintiffs in settlement of their claims against defendants Cessna, Garrett, and Teledyne:

| Schuler Estate | | Wilson Estate | |
|---|---|---|---|
| Cessna | $280,000.00 | Cessna | $120,000.00 |
| Garrett | 2,500.00 | Garrett | 2,500.00 |
| Teledyne | 15,000.00 | Teledyne | 10,000.00 |
| Total | $297,500.00 | Total | $132,500.00 |

In addition, the Wilson estate has apparently agreed to pay the sum of $75,000 to the Schuler

be addressed prior to evaluating the individual claims of the plaintiffs. The first issue to be decided is the question of whether Michigan or Federal law applies to certain aspects of plaintiffs' claims. Wrongful death actions against the United States are governed by the provisions of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), 28 U.S.C. § 2671 *et seq.* Under this act, questions of substantive law regarding damages are determined according to the law of the state where the cause of action arose, in this case Michigan. *Douglas v. United States*, 658 F.2d 445 (6th Cir.1981). However, in deciding evidentiary issues, the Federal Rules of Civil Procedure are controlling. Likewise, to the extent the substantive law of the state imposes damages which are punitive in nature, such damages are not compensable under the FTCA. *Flannery for Flannery v. United States*, 718 F.2d 108 (4th Cir. 1983). To the extent plaintiffs seek damages in excess of actual losses incurred, the Court concludes that federal law controls the issue and they are not recoverable against the Government. *Hartz v. United States*, 415 F.2d 259 (5th Cir.1969).

## A. ADMINISTRATIVE CLAIMS UNDER THE FTCA

█ It has been the Government's position in this case that neither the Schuler children nor the Wilson children should be allowed to recover damages. This contention is based on the alleged failure of the children to file individual administrative claims with the federal government. The Government asserts that, absent an individual claim filed in their own behalf or adequate identification of the derivative claims in the administrative filings of Ethelyn Wilson and Janice Schuler, the Court lacks jurisdiction to award damages to the children. The plaintiffs contend that the claims filed by the personal representatives of the decedents' estates were sufficient to satisfy the administrative claim requirements of the FTCA.

A ruling on this issue was made on December 16, 1986, during the damages portion of the bench trial. At that time, the Court held that the administrative claims filed by the respective personal representatives of the Schuler and Wilson estates preserved the rights of the decedents' children to recover for losses suffered. The Court's decision on this issue was made after taking into consideration the arguments presented and the relevant statutory and case law. First, the Court noted that under Michigan law, the personal representative, not individuals who may be entitled to share in the decedents' estates, are the proper parties to pursue a wrongful death claim. M.C.L.A. § 600.2922. As such, Ethelyn Wilson and Janice Schuler were the proper claimants. In addition, the Court relied on the fact that the Government either knew or should have known that a claim filed by the personal representatives on behalf of the estates necessarily included the claims of the decedents' children. The Government also could have requested additional information from the personal representatives of the estates, had it felt further information was needed. 28 C.F.R. § 14.4. It is undisputed that both claims were filed in a representative capacity. It is also undisputed that the nature of the claims, wrongful death actions, was known to the Government. Thus the Court found that the Government had notice that the claims involved entailed all persons seeking to recover from the estate.

The Court distinguished those Court of Appeals cases relied on by the Government on the basis that the claims involved were not wrongful death actions but personal injury claims which could not reasonably give the Government adequate notice of the derivative claims involved. *See Rucker v. United States*, 798 F.2d 891 (6th Cir. 1986); *Keene Corporation v. United States*, 700 F.2d 836 (2d Cir.1983). In reaching its decision, the Court also declined to adopt the reasoning of the district court in *Van Fossen v. United States*, which held that the children of the de-

estate. It is agreed by the parties that this payment is in satisfaction of any claim the Schulers may have against Wilson. Accordingly, this amount will be deducted from any damages awarded.

ceased were proper claimants under the FTCA, notwithstanding state law to the contrary, 430 F.Supp. 1017 (N.D.Cal.1977).

Based on the facts and circumstances of this case, the purpose of the administrative claim requirement of the FTCA, and relevant case law, this Court held that all of the claims presented were properly before the Court. The decision of the Court was based, in part, on the reasoning of the Sixth Circuit Court of Appeals in *Douglas v. United States*, 658 F.2d 445 (1981), and *Adams v. United States*, 615 F.2d 284 (5th Cir.1980). *See also Locke v. United States*, 351 F.Supp. 185 (D.Hawaii 1972); *Majuri v. Sinacola Construction Co.*, 382 Mich. 391, 170 N.W.2d 27 (1969).

### B. INCOME TAX LIABILITY

■ Under Michigan law, future tax liability, for various reasons, is not to be considered in determining the amount of damages to be awarded. *Peterson v. Department of Transportation*, 154 Mich. App. 790, 399 N.W.2d 414, 419 (1986). It is plaintiffs' position that this rule is to be applied in the case before the Court. However, persuasive argument has been advanced by the Government, based on recent federal decisions, that in proceedings under the FTCA, evidence of future tax liability is a proper consideration in limiting the amount of economic damages awarded. There are several arguments advanced in support of this proposition. The first argument advanced points out that failing to factor in tax liability results in a damage award which is greater than necessary to compensate plaintiff for income which would have been received absent the untimely death of the decedent. As such the award would be punitive in nature and impermissible under the the FTCA. *See Flannery*, 718 F.2d 108 (4th Cir.1983). This reasoning is in line with cases brought under federal law, i.e., the Federal Employers' Liability Act, 45 U.S.C. §§ 51 *et seq. See Norfolk & Western Railway v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980).

The second argument advanced is that the failure to adjust damage awards to reflect tax liability is in conflict with the purposes of the FTCA to compensate for losses sustained and not to provide a windfall which plaintiffs would not have received had the tortious conduct not occurred. *Trevino v. United States*, 804 F.2d 1512 (9th Cir.1986). In addition, it is argued that the rationale for excluding such evidence, confusion to the jury, avoiding possible miscalculations in the amounts to be awarded, and the speculative nature of future tax liability, is largely ameliorated by the fact that it is the Court, not a jury, which decides the amount of damages awarded in a claim against the Government. Thus, the possibility of error or confusion is significantly diminished. *See Kalavity v. United States*, 584 F.2d 809 (6th Cir.1978).

An additional basis for considering tax liability in FTCA cases is that the question of whether taxes are to be considered is evidentiary in nature. As such, federal law and not state law controls the admissibility of such evidence. As the Supreme Court noted in *Liepelt*, failure to consider tax liability is to ignore the realities of modern life, 444 U.S. at 493, 100 S.Ct. at 757. In failing to consider tax liability, evidence is excluded which is relevant to the issue of damages. Absent compelling reasons for ignoring such evidence, the Court should at least consider the effect of tax liability on damage awards. *See In re Air Crash Disaster Near Chicago, on May 25, 1979*, 701 F.2d 1189 (7th Cir.1983).

Although the Sixth Circuit has not expressly decided this issue in the context of a FTCA claim, the Court of Appeals has indicated, in strong *dicta*, that while in cases of ordinary earnings tax liability should not be considered, where projected incomes are higher, such deductions may, in certain circumstances, be acceptable. *Kalavity v. United States*, 584 F.2d 809, 812 (1978). In reaching this conclusion, the Court of Appeals cited a FTCA case with approval, *Felder v. United States*, 543 F.2d 657 (9th Cir.1976). Thus, the Court concludes, given the clear trend in cases under federal law, consideration of tax liability in assessing damages is mandated.

■ Given the significant amount of potential income involved in the Schuler case, evidence concerning potential income tax liability will be considered in calculating the amount of economic damages awarded. However, as to any economic damages awarded to the Wilson estate, no reduction of economic damages will be made on the basis of future tax liability, given the clear weight of the evidence that any economic injury suffered was modest in amount.

### 1. SCHULER DAMAGES

■ Charles Schuler was 41 years of age at the time of his death. Under Michigan law, a person in normal health at age 41 has a statutory life expectancy of 34 years. M.C.L.A. § 500.834. Although there was evidence that Schuler's father suffered a heart attack, there was no evidence presented that Schuler was in poor health. To the contrary, the evidence establishes that Schuler was in excellent health. Thus, the Court finds that Schuler had a life expectancy of 34 years and a work-life expectancy of 24 years. On the issue of economic damages, the evidence reflects that Schuler was president of a Michigan company, Aspen Enterprises ("Aspen"), at the time of his death. The company had been formed in 1973 for the development of mobile home parks. On his death, Schuler's twenty-five per cent (25%) interest in the company was purchased by the partnership for $500,000 pursuant to a buy-sell agreement. The proceeds were distributed to Janice Schuler as part of the Schuler estate.

■ There was testimony from Ronald Piasecki, a former business associate of Schuler's, that Schuler was a driving force in the company. Piasecki also testified that Schuler was a very intelligent business man who provided leadership and vision to the enterprise, represented the company in matters of finance and, in general, was a guiding force in the development of the company. Thus the record reflects that the decedent Schuler was a person capable of generating income in the future. The critical issue in the case concerns not the ability of Schuler to earn money but the value to be assigned to the economic losses sustained by the estate.

In a tort claim, the assignment of a value to economic loss is often a difficult task. By its very nature, the calculation of lost wages, profits or earning capacity requires the Court to attempt to construct a picture of economic loss with some degree of certainty under circumstances which are less than ideal. Where the decedent was employed at a set salary, the task is still often difficult. Where, as in this case, the Court is being asked to predict lost income in the form of future earnings as well as to predict the value of lost earning capacity in a fluid situation, the difficulties of the task are often staggering. This does not mean, however, that the task is insurmountable.

Under Michigan law, damages for future earnings and lost earning capacity are recoverable only if such damages may be calculated with reasonable certainty. *Clissold v. St. Louis–San Francisco Ry. Co.*, 600 F.2d 35 (6th Cir.1979). Yet the law does not require a higher degree of certainty than the facts of the case permit. *Getman v. Mathews*, 125 Mich.App. 245, 335 N.W.2d 671 (1983). There are, however, limitations imposed on the amount of damages which may be awarded. Damages which are speculative in nature may not be recovered. *Id.* Damages for lost profits must be based on loss of net, rather than gross, profits. *Id.* In all instances, however, absent a legal basis to the contrary, the weight to be given the evidence rests within the sound discretion of the trier of fact.

A substantial portion of plaintiff's evidence on economic damages was offered through the testimony of Piasecki. Piasecki had known Schuler for many years. He testified that Schuler and he had been business associates for many years, first in the practice of law, later in conjunction with Aspen. Piasecki testified that both men left the legal profession in 1980 to devote all of their energies to real estate development, primarily the owning and operation of mobile home parks. There were four partners in the business, Schuler, Piasecki, Lee De Visser and Jim Lanting.

This relationship continued until Schuler's demise in 1981.

It was Piasecki's testimony that in the year immediately following Schuler's death, the company experienced financial difficulties. The reason proffered for these difficulties was the fact that Schuler had been the primary negotiator for the company on matters of finance and that banks experienced a lack of confidence in the continued viability of Aspen in Schuler's absence. In response to these difficulties, the company took on another partner, Arlyn Lanting. The evidence reveals that in addition to a capital infusion of approximately $1,300,000, Arlyn Lanting brought to the company both business and finance expertise. It is the Government's contention that it was the addition of Arlyn Lanting which has led to the financial success of Aspen and that, but for Schuler's death, Lanting would not have become a partner in the company. Thus, the Government contends that the success of Aspen is irrelevant for purposes of determining the economic damages sustained by the Schuler estate. The Court does not agree. There is evidence presented which leads the Court to conclude that Aspen's success is relevant to the issue of economic damages.

Piasecki offered testimony concerning the present market value of Aspen. He stated that in his opinion the value of the company was between ten and twelve million dollars and that the value of his twenty-five per cent (25%) of the business was between two and one-half and three million dollars. No documentary evidence was offered by plaintiffs in support of these contentions other than Piasecki's personal financial statement dated September 30, 1986.

It was also Piasecki's testimony that since Schuler's death he has personally taken approximately $600,000 in cash from the business. It was not revealed whether the money withdrawn represented salary or otherwise. Nor was it revealed whether the other partners in the company have withdrawn similar amounts. He did, however, testify that his salary for 1986 was $150,000. In addition, he explained that,

prior to Schuler's death, most of the earnings in the business were not distributed to the partners but were plowed back into the company.

Piasecki's 1986 financial statement revealed that he currently owns an equity interest in Aspen valued by Piasecki at $2,890,148. The document also reveals that the total contingent liability of Aspen is presently $5,074,808. Twenty-five per cent (25%) of that figure is $1,268,702. The Government objected to both the admissibility as well as the credibility of Piasecki's testimony and the 1986 financial statement offered in support thereof. It is plaintiff's position that this document is credible because it is used for Securities and Exchange Commission filings in connection with Aspen's public offerings of syndicated interests in real estate as well as being used for other business purposes.

The Court finds that both are credible and relevant to the issue of Schuler's lost income and earning capacity. In determining lost profits or wages, it is proper to consider evidence of salary or profits earned by similarly situated persons, since such testimony has a tendency to prove what the decedent would have earned had he or she remained in a particular line of business. *Goins v. Ford Motor Co.*, 131 Mich.App. 185, 347 N.W.2d 184 (Mich.App. 1983). However, the Court finds neither conclusive on these issues. Rather, the testimony and supporting financial statement is but one factor utilized by the Court in arriving at a reasonable amount of economic damages to be awarded. In reaching its conclusion, the Court has taken into consideration not only the testimony offered but also the reasonable inferences to be drawn from evidence which plaintiff could have offered in support of its estimate of economic loss. No appraisals, independent or otherwise, of the value of Aspen or its real estate holdings have been offered.

It is plaintiff's contention that the increase in value of Aspen should be projected throughout the work-life expectancy of Schuler. However, plaintiff has submitted no expert testimony concerning the project-

ed earnings of either Schuler or the company. Nor has any evidence been offered that Aspen's earnings to date, as offered by Piasecki, are certain to continue indefinitely. Indeed, Piasecki's testimony reveals that the continued profitability of real estate investment companies, including Aspen, is uncertain. When asked by the Government why the Schuler estate had not invested in Aspen, Piasecki replied, "[p]erhaps her advisors felt these [the investments] were too risky...." This statement indicates to the Court the speculative nature of plaintiff's contention that substantial increases in the value of Aspen would continue throughout the decedent's work-life expectancy.

On cross-examination the Government exposed certain inconsistencies in the figures offered by Piasecki. Piasecki admitted to certain inaccuracies on the financial statement. He also admitted that the nature of the real estate business is to develop large depreciation losses which reduce tax liability. He further admitted that the finance statement figures were pre-tax figures subject to capital gains tax on liquidation. He further testified that the increase in value of Aspen, although not reflected on Schuler's tax return, would be reported as a sale of a capital asset if liquidated.

It is undisputed that Schuler's interest in Aspen was purchased by the company and its partners for $500,000. Thus, the estate has been partially compensated for Schuler's interest in the business. In reaching a figure for economic loss, this compensation must be subtracted from any figure derived by the Court. In addition, a reasonable rate for investment return on these funds must be considered. This is necessary to avoid overcompensation of the estate. Twenty-five per cent (25%) of the funds contributed to Aspen by Arlyn Lanting must also be subtracted from the economic value of Schuler's interest in the

company as reflected by Aspen's present worth. But for Schuler's death, those funds would not have been available.

Janice Schuler also testified about the financial condition of the Schuler estate. Her testimony was that the value of the Schuler estate, less insurance proceeds, was approximately $1,340,000.[2] She further testified that this figure represents income accumulated over a five-year period. Her testimony was also that, in addition to the interest in Aspen, her husband held interests in two radio stations and other business interests as well. Janice Schuler was unable to provide much insight into the exact nature of the funds except to say they were not derived from the practice of law. While not dispositive, the Court concludes that the testimony of Janice Schuler is relevant to the issue of economic damages. However, the Court concludes that there is no evidence presented from which to infer that the average yearly earnings reflected by this figure, $268,000, would have continued indefinitely into the future.

 The Government contends that the economic loss of the Schuler estate should be calculated on the basis of the income tax returns filed for the years 1977 through 1980. These returns reflect an average yearly income of $62,836.75. Although relevant to the issue of damages, the Court finds these figures inconclusive. The Court finds that the returns do not adequately reflect the decedent's earning capacity. Nor do they reflect Schuler's interest in Aspen, the two radio stations or other business holdings. Rather the income tax returns and the figures reflected therein are but one factor to be considered along with other evidence on the subject.

 Based on the evidence available, as well as reasonable inferences to be drawn therefrom, the Court concludes that the economic loss to the Schuler estate is

---

**2.** The 1981 income tax return as well as the 1981 estate tax return filed by the Schulers are not in evidence. The 1981 income tax return was withdrawn by the Government. The 1981 estate tax return was offered but not admitted on objection by the Government. Accordingly, those documents have not been considered by the Court in reaching its decision. However, as to information given by witnesses based on personal knowledge, such evidence has been considered.

$1,650,000. This figure represents lost income as well as lost earning capacity. In determining the extent of economic loss, the Court declines to project earnings in the form of loss profits from Aspen throughout the decedent's projected work-life expectancy. Although evidence presented provides some indication of future earnings, it did not adequately resolve uncertainties about personal and business reversals and other future contingencies so as to allow the Court to project continued earnings, at the levels suggested, for such a protracted time into the future. To do so without further supporting evidence would have been speculative and purely conjectural. Accordingly, the future income awarded for business profits and investments was limited to a period of ten years. *See Haley v. Pan American Airlines*, 746 F.2d 311 (5th Cir.1984); *Martin v. Petrofina Inc.*, 785 F.2d 543 (5th Cir.1986); *Davidson v. General Motors Corp.*, 357 N.W.2d 59 (1984).

In addition to the limitation on future profits, the following factors were considered in arriving at a reasonable rate of compensation for economic loss to the Schuler estate: 1) average yearly income tax liability at rates suggested by the Internal Revenue Service documents admitted into evidence, or thirty-three per cent (33%); 2) the amount of monies already received in payment for Schuler's interest in Aspen, including a reasonable rate of investment return thereon, or twelve per cent (12%); 3) a reasonable reduction to present value after consideration of projected inflation, or six per cent (6%). *See Reminga v. United States*, 448 F.Supp. 445 (W.D.Mich.1978), *aff'd* 631 F.2d 449 (6th Cir.1980); M.C.L.A. § 600.2922(6); and 4) the percentage of income which would have been utilized by decedent for his own benefits, five per cent (5%) of the total income. *See Dyer v. United States*, 551 F.Supp. 1266, 1282 (W.D.Mich.1982).

With respect to the Schulers' non-economic losses, the record reflects that Charles and Janice Schuler had been married for over twenty years. Janice Schuler suffers from a debilitating illness, heavily relied on her husband for comfort and support, and could reasonably have expected to spend the remaining 34 years of her husband's life expectancy in his company.[3] Although there was some evidence presented that Schuler had once engaged in an extramarital affair, the Court finds that, even if true, this information does not detract from the relationship the Schulers shared at the time of his death or the loss experienced by Janice Schuler. The testimony before the Court reveals a woman dependent on her husband in more ways than usual and who, without the emotional and physical support provided by Schuler, has suffered from the loss of his comfort and companionship and his assistance in the raising of their daughter, Kathryn. The Court finds that Janice Schuler has suffered non-economic losses in the amount of $750,000.

The Schuler children, Charles and Kathryn, were ages 18 and 15 respectively at the time of their father's death. Both were dependent on their father for financial and emotional support. Kathryn, a minor at the time of Schuler's demise, lived at home with her parents. Charles lived away at college, Notre Dame, but still maintained close contact with his father and relied on him for financial support and guidance. The testimony establishes that the relationship between the Schuler children and their father was a close one. The undisputed evidence demonstrates that Schuler was a significant factor in his children's lives. They shared many activities together and the children spent much time in their father's company. Each testified that they have suffered as a result of Schuler's death and the Court so finds. Charles, in particular, was extremely close

---

3. The Court notes that while there is some indication that Janice Schuler suffers a debilitating illness, no evidence of its effect on Mrs. Schuler's life expectancy has been presented. As a result, there is no evidence upon which to base a reduction of non-economic loss based on the decreased life expectancy of Janice Schuler. Absent evidence to the contrary, the Court is bound to follow the Michigan statutory mortality tables. *Espana v. United States*, 616 F.2d 41 (2d Cir.1980); *Garton v. Powers*, 252 Mich. 442, 445, 233 N.W. 373 (1930).

to his father. The Court further finds that the value of the non-economic loss of each of the Schuler children is $200,000.

## 2. WILSON DAMAGES

■ Richard Wilson was 61 years of age at the time of his death. Under Michigan law, a person in normal health at age 61 has a statutory life expectancy of 15.44 years. M.C.L.A. § 500.834. However, there was undisputed evidence presented at trial that Wilson was not in excellent health. There was evidence presented that he suffered from numerous physical ailments, including asthma and hypertension. Based on these facts, the Court finds that Wilson had a life expectancy of ten years and a work life expectancy of four years at the time of his demise.

■ Decedent Wilson was the owner and operator of a commercial air-taxi service. Ethelyn Wilson testified that she was also involved in the operation of the business. The record reflects that the business was successful yet not overwhelmingly so. The record also reflects that in the past four years, Wilson earned an average income of approximately $11,000 per year. The income tax forms in evidence establish that Wilson's income varied widely, from no taxable income in 1980 to over $33,000 in 1978.

There is no evidence presented which supports the likelihood of a substantial increase in Wilson's income, had he survived the crash, other than the unsupported opinion testimony of Janice Schuler and Ethelyn Wilson, which the Court finds speculative. Likewise, the Court finds that the testimony of Ethelyn Wilson, indicating the decedent would have continued in the air-taxi business beyond the age of 65, thereby generating additional income, must be discounted due to the lack of any evidence as to the length of time Wilson planned to continue in the business and due to the tenuous nature of the decedent's physical condition. Based on these facts, and the moderate nature of this income, the Court finds the value of reasonable compensation for economic losses suffered by the Wilson estate to be $60,000, after deduction of a reasonable amount for personal consumption by the decedent. This figure also reflects a discount to present value of six per cent (6%).

■ With respect to the Wilsons' non-economic losses, the record reflects that the Wilsons, Richard and Ethelyn, were extremely close and spent the majority of their time together. They had been married for over forty years and shared most activities, including work and recreation. Ethelyn Wilson was 56 years old at the time of her husband's death, had a ·life expectancy of 18.97 years, and could have reasonably expected to spend the remaining 10 years of her husband's life expectancy in his company. The testimony of Ethelyn Wilson also establishes that she has suffered greatly due to the loss of her husband. This testimony was supported by the testimony of the Wilson children. Based on these facts, the Court finds the non-economic loss suffered by Ethelyn Wilson to be $250,000.

■ The Wilson children—Alan, Robert, Thomas, David and Debra—were all adults at the time of their father's death. However, the Court finds that they are nonetheless entitled to compensation for the non-economic losses suffered. The testimony establishes that the relationship between the Wilson children and their father was a close one. The undisputed evidence demonstrates that Wilson was a significant factor in his children's lives and that they have suffered as a result of his death. As a result, the Court finds that the value of the non-economic loss of each of the Wilson children is $50,000.

■ The damages awarded to the Wilson estate and family members are to be reduced by the value of the settlements negotiated with Cessna, Garrett and Teledyne. After these amounts are deducted, the remaining sums are to be further reduced in proportion to the negligence of Richard Wilson, or eighty per cent (80%).[4]

---

**4.** Although the Government urges a contrary interpretation, the method of computation of

## III. CONCLUSION

For the reasons stated above, the Court finds that defendant United States of America is liable to the Schuler estate for damages totalling Two Million Four Hundred Twenty-Seven Thousand Five Hundred Dollars ($2,427,500).[5] The Court further finds that defendant United States of America is liable to the Wilson estate for damages totalling Eighty-Five Thousand Five Hundred Dollars ($85,500). A summary of the damages awarded is attached.

### SUMMARY OF DAMAGES AWARDED

1. SCHULER DAMAGES

| | |
|---|---|
| Economic loss— | |
| Schuler Estate | $1,650,000.00 |
| Non-economic loss— | |
| Janice Schuler | 750,000.00 |
| Charles Schuler, III | 200,000.00 |
| Kathryn Schuler | 200,000.00 |
| Sub-total: | $2,800,000.00 |
| Less Settlement Monies Received | − 372,500.00 |
| TOTAL AWARD: | $2,427,500.00 |

2. WILSON DAMAGES

| | |
|---|---|
| Economic loss— | |
| Wilson Estate | $ 60,000.00 |
| Non-economic loss— | |
| Ethelyn Wilson | 250,000.00 |
| Alan Wilson | 50,000.00 |
| Robert Wilson | 50,000.00 |
| Thomas Wilson | 50,000.00 |
| David Wilson | 50,000.00 |
| Debra Wilson | 50,000.00 |
| Sub-Total: | $ 560,000.00 |
| Less Settlement Monies Received | − 132,500.00 |
| Sub-Total: | $ 427,500.00 |
| Less eighty per cent (80%) negligence Richard Wilson | − 342,000.00 |
| TOTAL AWARD: | $ 85,500.00 |

comparative negligence claims, as interpreted by the Michigan Supreme Court, is clearly set forth in *Rittenhouse v. Erhart,* 424 Mich. 166, 380 N.W.2d 440 (1986). Inasmuch as *Rittenhouse* is the latest pronouncement by the Michigan Supreme Court on this subject, the Court is bound by that interpretation. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The method of reduction of award for settlement of claims utilized by this Court is in accordance with that decision.

5. Having awarded total damages below the five million dollar limit of the administrative claims filed, the Court need not address the issue of whether plaintiffs' recovery was limited by that amount.