Monteger McCraw WARD, Fredrick Neal McCraw, Dale Kent McCraw and Paul Kirk McCraw

v.

**UNITED STATES of America.**

**No. CA 3–75–0749–C.**

United States District Court, N. D. Texas, Dallas Division.

Nov. 22, 1978.

As Amended Jan. 24, 1979.

John Howie, Law Offices of Windle Turley, Richard N. Johnston, Dallas, Tex., for plaintiffs.

Kenneth J. Mighell, U. S. Atty., Dallas, Tex., Gary W. Allen, Trial Atty., Litigation Div., Federal Aviation Administration, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM M. TAYLOR, Jr., District Judge.

The above case came on to be tried before the Court without a Jury on November 2, 1977. Upon consideration of the pleadings, the evidence, the argument and briefs from counsel, the Court makes the following findings of fact and conclusions of law, in accordance with the provisions of Rule 52, Federal Rules of Civil Procedure.

### FINDINGS OF FACT

1. At approximately 6:45 CST (0045 GMT), on December 18, 1972, a Cessna model 210 aircraft, registration number N3319S, crashed near the Greater Southwest Airport in poor weather conditions. The pilot, plaintiffs' decedent, George D. McCraw, was the sole occupant of the aircraft and was killed in the crash.

2. The Cessna 210, N3319S, had been purchased by Mr. McCraw's nephew, Dan Daughdrill, an aircraft broker, and was being ferried from Atlanta to Dallas by Mr. McCraw on Daughdrill's behalf.

3. Records from the Atlanta Flight Service Station (FSS) show that Mr. McCraw called the FSS at 6:34 a. m. CST (1234 GMT) on the morning of the flight and requested a pre-flight weather briefing for a flight to Dallas. No flight plan was filed.

4. Mr. McCraw departed the Atlanta area at approximately 1:30 p. m. CST (1930 GMT) as the pilot and sole occupant of N3319S.

5. Mr. McCraw did not obtain any further weather briefings from the FSS between 6:34 a. m. and the time of his departure some seven hours later.

6. The flight proceeded under Visual Flight Rules (VFR) from Atlanta to the vicinity of Monroe, Louisiana. Under this

method, the pilot can proceed via the route and altitude of his own choosing, controlling his aircraft primarily by visual references outside the aircraft and separating himself from other airplanes by the "see and avoid" method.

7. While enroute, a pilot may contact the nearest Flight Service Station and request the same weather reports and forecasts which are available in pre-flight briefings.

8. At no time during the flight from Atlanta to the vicinity of Monroe did Mr. McCraw request updated weather reports or forecasts for the Dallas-Fort Worth area.

9. At 4:17 p. m. CST (2217 GMT), the pilot called the Monroe FSS and requested the Monroe weather and forecast, which were issued to the pilot. The pilot did not request any other information.

10. At 4:35 p. m. CST, Mr. McCraw filed an Instrument Flight Rules (IFR) flight plan with the Monroe FSS. His flight plan did not include an "alternate" to be used if his approach at Lancaster could not be completed.

11. Upon learning of the pilot's destination, the FSS Specialist issued the current and forecast Dallas weather to Mr. McCraw.

12. At the time Mr. McCraw filed his IFR flight plan, weather reports and forecasts for the Dallas area required an alternate airport be filed under the provisions of FAR 91.83 (14 C.F.R.).

13. FAR 91.170 requires that, before operating an aircraft under IFR, the pilot ensure that the altimeter and associated systems have been inspected within the previous twenty-four months. At the time of this flight, the altimeter and its systems had not been so inspected.

14. Under FAR 91.5, a pilot is required to obtain weather reports and forecasts before undertaking an IFR flight. Mr. McCraw did not do so on this occasion.

15. By not checking weather reports and forecasts, Mr. McCraw could not comply with FAR 91.83, concerning alternate airports or FAR 91.23, concerning fuel requirements, both of which require knowledge of weather reports and forecasts.

16. Throughout the day on December 18, the aviation area forecast indicated a developing trough of low pressure which was moving into the Dallas-Fort Worth area. Associated with this low pressure trough were low ceilings, low visibilities, drizzle, fog, and relatively strong winds aloft. The weather in the Dallas-Fort Worth area was deteriorating throughout the day.

17. Hourly weather observations for many airports in the Dallas-Fort Worth area were transcribed and broadcast on the VOR facilities utilized by Mr. McCraw for navigation during this flight. He could have received this information by simply monitoring these broadcasts. Additionally, weather observations, plus any other weather information required, was available upon request from any Flight Service Station. However, no further contacts with Flight Service Stations were made by Mr. McCraw after he left the Monroe area.

18. During and after the time period involved in this accident, the weather east of the Dallas-Fort Worth area remained good. Pounds Field in Tyler, Texas, remained above the weather minima required for Visual Flight Rules (VFR) flight until approximately 9 p. m. CST on December 18.

19. As the aircraft proceeded toward its destination along an electronic course denominated as Victor 94, its flight was handled by controllers in the Fort Worth Air Route Traffic Control Center (ARTCC). At approximately 5:45 p. m. CST (2345 GMT), the Center controllers began the coordination necessary to "hand off" N3319S to Dallas-Fort Worth Approach Control.

20. According to the transcript of communications and tape recordings of these communications, the Dallas arrivals coordinator was incredulous when informed that N3319S intended to land at Lancaster, because of the very poor weather conditions reported at the nearest reporting station (Red Bird Airport).

21. Dallas Approach Control furnished the current Red Bird weather to the Center, which passed it on to the aircraft at approximately 5:45 p. m. CST. The observation indicated a broken cloud ceiling at 300 feet above the ground, overcast clouds at 500 feet, and visibility of ¾ of a mile in drizzle and fog. In response to a question from the controller, Mr. McCraw stated he wanted to try the approach at Lancaster.

22. At 5:53 p.m. CST (2353 GMT), Mr. McCraw was informed that the weather at Red Bird was down to an indefinite ceiling, sky obscured, 200 overcast, visibility ¾ of a mile in drizzle and fog. This information was given to Mr. McCraw again at 6:08 p.m. CST (0008 GMT) when he was turned over to Dallas-Fort Worth Approach Control. Mr. McCraw again stated he intended to try the approach.

23. Mr. McCraw was cleared to proceed direct via Lancaster non-directional radio beacon, but the aircraft failed to properly "home in" on the beacon and flew past it off to one side. The pilot then accepted radar assistance in positioning the aircraft for the instrument approach at Lancaster.

24. At 6:13 p. m. CST (0013 GMT), after again being given the Red Bird weather, the pilot contacted Dan Daughdrill at the Lancaster Airport by radio, who told him the weather was too poor to complete the approach.

25. Mr. Daughdrill, who was familiar with the range capabilities of the Cessna 210, assumed that Mr. McCraw had refueled between Atlanta and Dallas. He testified that, if he had known Mr. McCraw had not done so, he would have been very concerned about the safety of the flight.

26. After talking to Mr. Daughdrill, Mr. McCraw requested to divert to Love Field at 6:15 p. m. CST (0015 GMT). The controller issued the Love weather at 500 feet overcast, visibility at 1½ miles in light drizzle and fog, and began to vector the aircraft for Love Field.

27. At 6:20 p.m. CST (0020 GMT), Mr. McCraw decided to go to Greater Southwest Airport after being advised of a thirty to forty minute traffic delay at Love Field. The controller then issued the GSW weather at 6:22 p. m. CST (0022 GMT) as 300 feet overcast, visibility ½ mile in light drizzle and fog with a runway visual range (electronically measured) of 3400 feet.

28. At this time, Mr. McCraw had approximately forty minutes' fuel remaining; however, he did not provide this information to air traffic control nor request priority handling to either Love or GSW.

29. FAR 91.125(c) requires that a pilot of an aircraft operating under IFR shall report to ATC as soon as possible any information relating to the safety of flight.

30. The pilot was vectored to the final approach course for the runway 13 ILS (Instrument Landing System) approach by Mr. James R. Goetsch, a duly qualified air traffic controller working the FR-3 position in the Dallas-Fort Worth Approach Control (TRACON).

31. At 6:30 p. m. CST (0030 GMT), the pilot was cleared for the ILS approach and was expected to intercept and fly the 130 degree final approach course utilizing his cockpit instrumentation.

32. The FR-3 controller observed the aircraft target on his radar scope make a marked deviation from the final approach course, turning to a track of about 240 degrees. When queried whether he had the correct radio facility tuned in to his ILS receiver, Mr. McCraw replied that he did, but stated that he was "having one heck of a time keeping this thing in the cage". Mr. McCraw regained the final approach course prior to passing the outer marker, and the FR-3 controller transferred communications with the aircraft to the local controller, Mr. Tina Gristy, in the Tower cab. The FR-3 controller continued to monitor the approach of the aircraft on his radar.

33. After passing the outer marker and commencing its descent, the aircraft again made excursions from the final approach course, going well off course to the right. Mr. McCraw then told the local controller that he would have to make a missed approach, and stated that he had not received

either the outer or middle marker beacons as he made the approach.

34. The aircraft was returned to the FR-3 controller and, while being vectored for another approach, Mr. McCraw requested an ASR (Airport Surveillance Radar) approach because he was "working with some equipment I'm not real sure of."

35. An ASR approach is one in which the air traffic controller provides azimuth or heading guidance to the aircraft in order to align it with the final approach course. It is critical that the pilot comply with the heading instructions issued by the controller, so that the controller can observe the resulting ground track on his radar and issue appropriate heading changes to the pilot.

36. One minute after requesting the ASR approach, Mr. McCraw stated "Could you get me in kinda short, I'm getting a little low on gas." In response to a question from the controller concerning the amount of fuel on board, Mr. McCraw replied, "Well, we're getting down to pretty close to the pegs on both of them"; and, after being queried as to the number of minutes of fuel, he stated, "I'd say twenty minutes."

37. Neither Roys Jones, plaintiff's air traffic control expert, nor Jack Hull, plaintiff's pilot expert, could explain Mr. McCraw's deviations from the final approach course on his attempted ILS approach. Mr. Hull testified, and the Court so finds, that the successful completion of an ILS approach under the weather conditions then existing was not beyond the capabilities of a proficient instrument pilot.

38. Beginning at 6:39 p.m. CST (0039 GMT), the FR-3 controller, Mr. Goetsch, properly considered N3319S to be in emergency status.

39. Mr. McCraw's request for an ASR approach, and then his request for a shortened approach, imposed additional workload on the FR-3 controller, who had to dispose of other aircraft he was handling in order to devote the bulk of his attention to N3319S. The air traffic control system works best when the pilot makes ATC aware of potential difficulties in a timely fashion. Mr. McCraw failed to give ATC timely notification of his dwindling fuel status in the last 45 minutes of this flight.

40. At the time McCraw made his decision to remain at GSW and conduct an ASR approach, he had received current weather information for Red Bird, Dallas Love, and Greater Southwest Airports within the previous thirty minutes, and was aware of the weather conditions in the terminal area.

41. The responsibility for determining the course of action to be followed under these emergency circumstances rested with the pilot, George McCraw, by virtue of the Federal Aviation Regulations (FAR 91.3) and the custom and practice of the aviation industry.

42. The Terminal Air Traffic Control Manual prescribes the procedures and phraseologies utilized by air traffic controllers in the handling of aircraft in the terminal area.

43. The Terminal Air Traffic Control Manual does not and cannot cover every possible situation which might arise in the event of an emergency in flight. Accordingly, paragraph 1800 of the Manual instructs air traffic controllers to use their best judgment in handling emergencies, and to conform as closely as possible to the provisions of the manual.

44. The Manual sets forth procedures and phraseologies to be used in the conduct of a normal, non-emergency ASR approach. It does not contemplate the shortened or abbreviated ASR approach requested by Mr. McCraw in this case. Accordingly, the FR-3 controller was required to apply his skill and judgment and adapt the procedures of the Manual to this emergency situation.

45. The Manual advises controllers, in paragraph 1801, to base the assistance provided to aircraft in an emergency on information and requests received from the pilot, and reminds controllers that the pilot is responsible for determining the course of action to be followed pursuant to FAR 91.3.

46. A pilot is expected to be aware of the option of landing at any airport within the range of his aircraft. When a pilot requests an emergency approach to a specific airport, the responsibility of the air traffic controller is to comply with the pilot's request to the extent possible, given the existing facilities and traffic conditions.

47. During this time period, the FR-3 controller could see the airspace surrounding Love Field, and was aware that there were approximately 15 aircraft lined up for the final approach course to that airport.

48. It would not have been prudent for the FR-3 controller, Mr. Goetsch, to suggest to an aircraft with twenty minutes or less fuel remaining that the aircraft divert to another airport. It should not have been necessary for the pilot to have been reminded of this option and had he wished to proceed to Love, he could have made such a request.

49. Although the ceiling and visibility were somewhat greater at Love than at GSW, it is purely speculative as to whether the aircraft could have been vectored to Love's final approach course before fuel exhaustion, and also as to whether the pilot could have successfully completed any approach there.

50. Prior to beginning the approach, the FR-3 controller issued the minimum descent altitude, the field elevation, and advised the pilot that weather conditions remained the same as on his previous approach. The provision of this information was in accordance with applicable paragraphs of the Terminal Air Traffic Control Manual.

51. The FR-3 controller informed the aircraft that he would advise the pilot when to begin descent, and told the pilot to reduce to approach speed. The Court finds that, under the circumstances, this complied with paragraph 1471 of the Manual, which states that advanced notification of descent will be given on ASR approaches.

52. Testimony at trial revealed that the FR-3 controller did not issue procedures to be utilized in the event of lost radio communications under paragraph 1421 of the Man-

ual, because he believed that the erratic performance of the aircraft and its close approach pattern required his full attention to providing guidance to the aircraft. The Court has no reason to dispute this judgment of the controller, and notes further that all experts agreed that no loss of communications was involved in the occurrence of the accident.

53. The evidence at trial indicated that the FR-3 controller did not provide missed approach instructions prior to commencing the ASR approach, as specified in paragraph 1441 of the Manual, but waited until a missed approach maneuver was required and then issued a heading and altitude to the aircraft. The controller testified that he wanted to give the pilot only the information necessary to successfully fly the final approach course, and did not want to burden the pilot with nonessential information. The Court finds that, based on the pilot's erratic performance, the controller's concern was valid, and further notes that the pilot received and acknowledged his missed approach instructions, when issued, without difficulty.

54. According to the testimony of the FR-3 controller, Mr. Goetsch, and the transcript of communications with the aircraft, the FR-3 controller provided headings for the aircraft to fly in order to fly the final approach course to runway 13. Additionally, the controller provided trend information concerning the aircraft's position with respect to the center line, all in conformance to paragraph 1473 of the Terminal Air Traffic Manual.

55. The pilot received and acknowledged each heading instruction issued by the controller, and was obligated by FAR 91.75 to conform to these air traffic control instructions.

56. Despite his acknowledgement of the headings, the track of the aircraft as observed by the FR-3 controller was very erratic and was characterized by radical deviations from the headings provided by the controller.

57. When the pilot appeared unable to fly a given heading, the controller incorpo-

rated "no-gyro" techniques to issue simple turn instructions to the aircraft. These turn instructions were received and acknowledged by the pilot.

58. Despite the receipt and acknowledgement of the turn instructions, the FR-3 controller observed the radar target deviate radically to the right when a left turn had been issued to the aircraft.

59. When the FR-3 controller observed the aircraft in a position from which a safe approach could not be completed, well to the right of the final approach course and proceeding generally westbound, he discontinued the approach and instructed the aircraft to fly a heading of 260 and climb back to 1500 feet for another approach. The heading and altitude were received and acknowledged by the pilot.

60. The heading and altitude issued by the air traffic controller were appropriate under these circumstances and were reasonably designed to insure the safety of the aircraft.

61. The aircraft was flying a heading of approximately 260 degrees at the time of the crash, and cruised into some woods with the right wing slightly low and the nose slightly low.

62. The emergency situation out of which this accident grew was created by the pilot's failure to insure an adequate fuel supply when operating into an area of known poor weather, and his failure to take action when a retreat to better weather to the east was still a viable alternative.

63. The cause of the crash was the pilot's negligent failure to climb to and maintain 1500 feet as instructed by the FR-3 controller.

64. There was no negligence in the handling of N3319S by the FR-3 controller, Mr. James Goetsch.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

2. The substantive law of Texas is applicable to this civil action, as it is the site of the allegedly negligent acts and omissions of the Defendant. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

3. The Federal Aviation Regulations have the force and effect of law. *United States v. Schultetus,* 277 F.2d 322, 327 (5th Cir.), *cert. denied,* 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960).

4. The Plaintiffs have the burden of proving by a fair preponderance of the creditable evidence that an act or omission on the part of Air Traffic Control proximately caused this accident. The Plaintiffs have failed to meet that burden; therefore, there is no act or omission on the part of Air Traffic Control in this case which proximately caused this accident.

5. The Federal Aviation Regulations, having the force of law, have assigned the ultimate responsibility for the operation of aircraft to the operators of aircraft, not to air traffic personnel on the ground. *United States v. Schultetus, supra; United States v. Miller,* 303 F.2d 703 (9th Cir. 1962).

6. The pilot in command of an aircraft is directly responsible for, and has the final authority as to, the operation of that aircraft. 14 C.F.R. 91.3; *American Airlines v. United States,* 418 F.2d 180 (5th Cir. 1969).

7. The procedures utilized by Air Traffic Controllers in a terminal environment are provided by the Terminal Air Traffic Control Manual 7110.8. This Manual provides that, in emergency situations, controllers are to exercise their best judgment in meeting situations not covered by the Manual.

8. The actions of the FR-3 controller, Mr. James Goetsch, conformed as closely as practicable to the Manual and were not negligent.

9. In emergency situations, controllers are to give distressed planes priority to the extent consistent with the rules governing separation of aircraft and to give the pilot any assistance which he requests. No

other duty is or should be imposed upon controllers. *Deal v. United States,* 413 F.Supp. 630, 637 (W.D.Ark.) *aff'd* 552 F.2d 255 (8th Cir.), *cert. denied,* 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 175 (1977).

10. When Mr. McCraw requested a shortened ASR approach because of his emergency fuel status, the visibility exceeded the minimum value required for approval of this request, and therefore no basis existed for the FR-3 controller to deny the pilot's request for such an approach.

■ 11. Once the controller duly granted the pilot's request for the ASR approach, the operation of the aircraft in accordance with air traffic instructions was the sole responsibility of the pilot, with which the air traffic controller was not to interfere. *American Airlines v. United States,* 418 F.2d 180 (5th Cir. 1969); 14 C.F.R. 91.3.

■ 12. Before a pilot can be held legally responsible for the movement of his aircraft, he must know or be held to have known those facts which were then material to its safe operation. Certainly the pilot is charged with that knowledge which, in the exercise of due care, he should have known. *American Airlines, supra.*

13. Mr. McCraw was provided with abundant weather information by Air Traffic Control which was material to his safe flight, and knew or should have known of the hazard it posed. Additionally, he knew or should have known of his critical fuel situation as he approached the Dallas-Fort Worth area.

14. Defendant, United States, is entitled to judgment in its favor.