**Kathy Lynne THURSTON, Individually and as Personal Representative of the Estate of her Husband, Curtis Leo Thurston, Deceased, and as Parent and Natural Guardian of their Minor Children, Jedediah, Jessica Lynne, and Cody, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 94–NC–34B.**

United States District Court,
D. Utah,
Central Division.

May 25, 1995.

Barry C. Hansen, Michael J. Pangia, Washington, DC, Dennis J. Conroy, Salt Lake City, UT, for plaintiff.

Steven J. Riegel, Viola Pando, Washington, DC, Carlie Christensen, Salt Lake City, UT, for defendant.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

BENSON, District Judge.

I. *Findings of Fact*

1. On January 16, 1993, Curtis Thurston, age 31, held a private pilot certificate permitting him to fly single-engine land airplanes, and a third-class medical certificate.

2. Mr. Thurston's pilot logbook indicates that he had logged 855 hours of total flight time prior to the accident.

3. Although he was experienced in flying in the local area, Mr. Thurston was only a "VFR pilot," restricted by law to flying in good weather conditions, outside of clouds. He did not have an "instrument rating," which is a legal and practical requisite for safe flight into clouds or areas of low visibility.

4. At the time of the accident, Mr. Thurston was flying a Stinson model 108–2 airplane, registration number N8004K. This is a single-engine, fabric covered airplane, powered by a 150 horsepower Franklin reciprocating carburetor-equipped engine. Mr. Thurston was the owner of the aircraft.

5. On Saturday morning, January 16, 1993, Mr. Thurston and two pilot friends, Andrew Nelson and Tim Corbitt, planned to fly their airplanes from Skypark Airport in Bountiful, Utah to Ogden, Utah, have brunch at the Ogden airport, then return to Skypark Airport. Mr. Thurston had frequently made this flight from Skypark Airport to Ogden.

6. The pilots kept their airplanes at Skypark Airport. The weather was good early in the morning, and the pilots spent several hours clearing snow from their airplanes.

7. Mr. Nelson chose not to fly. Mr. Corbitt took off, but elected to remain in the local vicinity of the airport, and returned for a safe landing.

8. The same morning, flight instructor Kerry Bybee arrived at Skypark Airport for

an instructional flight with one of her student pilots. After observing the weather, Ms. Bybee elected no to fly that day, but sat down with her student pilot inside one of the airport buildings to conduct a ground school session.

9. Mr. Thurston's departure from Skypark Airport, including his taxi, takeoff, and the initial several minutes of flight were not guided or monitored by air traffic controllers, because Skypark is an "uncontrolled" airport, with no control tower or radar facilities.

10. Shortly after Mr. Thurston's departure, a cold front passed through the area, causing the weather to deteriorate swiftly. Aloft, Mr. Thurston was soon trapped between fog below, clouds above, mountains to the East, and clouds (and restricted airspace) to the West. As these boundaries narrowed, Mr. Thurston was flying in an ever-smaller layer of airspace amidst drizzle, rain, and snow, maintaining visual reference by looking sideways at the mountainside.

11. Mr. Thurston's flight lasted approximately 25 minutes: from 1805 Zulu [1] to 1830 when the crash occurred. During the first twelve minutes of the flight, Mr. Thurston's airplane was not transmitting a transponder signal, and he was not in radio contact with any controllers. During the second eight minutes of the flight, Mr. Thurston's airplane was transmitting a "Code 1200" Mode C transponder signal, but he was not in radio contact with any controllers.

12. At 1824:09, Mr. Thurston first established radio contact with air traffic controllers at the Salt Lake City Terminal Radar Approach Control Facility (TRACON). These communications were tape recorded and were later transcribed in connection with the accident investigation. Mr. Thurston spoke with two radar controllers: Mr. Clark Wolverton, manning the TRACON's "Final" radar position (combined with the "Valley" radar position), and Mr. Curtis Miller manning the TRACON's "Bear" radar position (combined with the "Hart" radar position).

13. The "Final" radar position handles arriving airplanes during their final segment of approach to the airport, prior to their being handed off to the Control Tower for landing clearance. The "Bear" radar position handles aircraft in airspace farther north and east of the airport.

13A. The Court conducted a site visit to the TRACON during the trial, and viewed the air traffic controllers at the Final and Bear radar positions performing their duties, including listening to their communications with aircraft on a handset. During the site visit, the Court also viewed the radar depictions of aircraft, the video maps (including a demonstration of the process of changing from one video map to another), and the working environment of the controllers and supervisors.

14. Mr. Thurston spoke with the Final position controller from 1824:09 Zulu to 1826:53 Zulu, a period of approximately three minutes. This consisted of a total of 17 individual transmissions (to and from Mr. Thurston and the controller), interspersed with radio communications on the same frequency between the controller and five other aircraft.

15. Mr. Thurston made a series of radio transmissions to the Final controller, *none* of which stated or indicated any distress or emergency situation. His transmissions were a series of requests for "vectors".

16. A "vector" is defined as: "A heading issued to an aircraft to provide navigational guidance by radar." Pilot/Controller Glossary, Airman's Information Manual. Vectors are used in routine as well as emergency circumstances. A request by a VFR pilot for a vector, without more, does not give any notice of distress or emergency.

17. Mr. Thurston first requested that the Final controller vector him to Salt Lake City International Airport: "... I'm up over Bountiful would like to get vectored into Salt Lake" (Transcript ["Tr."] at 1824:15). This was a calm, routine transmission, in substance as well as in tone of voice.

---

1. All times are in "Zulu" time, or Coordinated Universal Time (formerly referred to as Greenwich Mean Time). To convert this time to local Mountain Standard Time, subtract seven hours. Therefore, 1805 Zulu minus 7 = 11:05 a.m. Mountain Standard Time.

18. The controller responded: "... [E]xpect half an hour delay for a special VFR clearance the field is IFR." (Tr. 1824:20). This meant that, because the airport was reporting instrument weather conditions, the only way that a VFR aircraft such as Mr. Thurston's could be authorized to land would be under "Special VFR Rules".

19. "Special VFR" is a procedure whereby VFR aircraft may be authorized to land at the Salt Lake City International Airport under weather conditions that are below VFR weather minima. "Special VFR" clearances are issued at the discretion of the controllers, and normally are not issued under circumstances in which arriving instrument aircraft would be delayed.

20. At the time Mr. Thurston requested a vector in to Slat Lake City International Airport, the Final controller was busy because of two circumstances: the airport was IFR; and only one instrument approach was available to one runway for arriving aircraft, since the instrument approach to the other runway was out of service.

21. Therefore, the half-hour delay was due to the steady stream of instrument arrivals then being worked by the TRACON; this flow of inbound aircraft was expected to continue for the next half-hour.

22. When the controller advised of the delay, Mr. Thurston had the option of remaining outside the Salt Lake City Terminal Control Area (TCA) and waiting for the clearance (or, at any time, declaring an emergency and stating his needs). Instead, he changed his request to a different destination airport: "... I'm up above Bountiful here and ah could you vector me into Sky Park [airport]". (Tr. 1824:26)

23. The Final controller looked at the position of the Aircraft, saw that it was not far from Sky Park Airport, and asked Mr. Thurston "... [D]o you see Bountiful Sky Park?" (Tr. 1824:37)

24. In a single sentence, Mr. Thurston said "negative" [i.e. that he did not see Skypark] and changed his mind once again as to his destination: "... [N]egative if possible ah can you vector me to Ogden [Airport]...." This transmission in substance canceled his request for vectors to Skypark, and replaced it with a new request for vectors to Ogden.

25. There is a standard practice in the Salt Lake TRACON not to give vectors to northbound VFR aircraft in the area east of the TCA, because of the narrow corridor available between the east boundary of the TCA and adjoining high terrain. Instead, the standard practice with respect to routine requests by VFR aircraft is to direct the pilots to landmarks related to the "VFR Flyways" depicted on the TCA chart so that the pilots can provide their own navigation and terrain clearance.

26. When Mr. Thurston requested vectors to Ogden, the Final controller, based upon this standard practice, did not provide vectors but instead asked Mr. Thurston if he could see the I–15 freeway. (Tr. 1824:47). When Mr. Thurston responded "negative" (Tr. 1824:49), the controller told him: "it's about a mile and a half to your ah of the west side of you" (Tr. 1824:52). The purpose of this transmission was to orient Mr. Thurston to the freeway so that he could provide his own navigation on the "VFR flyway" to Ogden.

27. The exchange continued in this routine nature, with Mr. Thurston responding "... I'll proceed due west now". (Tr. 1824:57). Radar data indicates that Mr. Thurston did in fact fly west at this time. Therefore, Mr. Thurston knew which way was west, and he could fly west away from the mountains if he wished.

28. Having devoted the previous minute of his time (eleven consecutive communications) to Mr. Thurston, the Final controller instructed Mr. Thurston to change to a different frequency. (Tr. 1825:09). Mr. Thurston acknowledged the frequency change (Tr. 1825:15), and the Final controller completed the exchange with a final instruction to "remain east of the freeway" (Tr. 1825:19), to remind Mr. Thurston that he was not cleared into the Terminal Control Area where he could interfere with the inbound flow of air carrier traffic. Obviously, the controller was assuming that Mr. Thurston, as a VFR pilot, was flying in visual weather conditions. Pi-

lots on VFR flights are required by the Federal Aviation Regulations to report to controllers if they encounter instrument flying weather.

29. At this point, Mr. Thurston made a transmission which overlapped, and was "blocked" by, a simultaneous transmission from an airliner, so that Mr. Thurston's transmission was not heard and understood by the controller. The transcript reads as follows:

1825:22 [N8004K]: "stinson zero four kilo I haven't got the freeway in sight you had better vector me (around) * sir."

1825:23 [SPA311] "Sierra pacific three eleven out of ten five for niner thousand."

30. Although the transcript sets forth the clear text of both transmissions, they occurred simultaneously (commencing one second apart) on two different radio frequencies, both feeding into the Final controller's headset at the same time.

31. The Final controller's next transmission made it clear to both aircraft (who could not hear one another) that their last transmissions had not been understood:

1825:30 [FINAL] "Delta calling say again."

32. Since neither calling aircraft (N8004K and Sierra Pacific 311) was a Delta airliner, this confirms that, from the controller's perspective, the two incoming transmissions "blocked" one another so that he could understand neither.

33. The controller's response ("Delta calling say again") indicates that Mr. Thurston's transmission ("... you had better vector me around sir") had *not* been received and understood.

34. This failed transmission by Mr. Thurston was the only transmission thus far that attempted to give any indication he might be in need of assistance (the combination of saying "I haven't got the freeway in sight" with "you had better vector me"). Unfortunately, since the Final controller did not hear the transmission, he could not take any action in response to it.

35. Mr. Thurston's next transmission 30 seconds later was partly unintelligible, and was again "stepped on" by another aircraft

(Tr. 1825:56). In addition, this transmission was made in the midst of an exchange between the controller and Sierra Pacific 311 about a collision hazard with another airplane (Tr. 1825:49 through 1826:00).

36. When Mr. Thurston made his next transmission to the Final controller a minute later, he made only a routine request to verify the frequency change, which was confirmed:

1826:48 N8004K "Salt Lake Approach Stinson zero four kilo do you want me to go over to one two one point one now sir?"

1826:53 FINAL "Affirmative Stinson zero four kilo".

37. Mr. Thurston did not declare an emergency, or a distress situation of any kind. He did not use any of the special terms designated for pilots to get emergency attention: "mayday," "pan," or "emergency". Moreover, the requests he did make were routine-sounding requests for navigational guidance, which were responded to in the normal manner by the busy air traffic controllers.

38. Mr. Thurston was receiving radar assistance designated as an "additional service" in the controller's handbook which designates their duty priorities (Ex. C, ¶ 2–2). This is a low priority duty, to be performed after the first priority duties of providing separation to instrument aircraft and issuing safety alerts.

39. If the Final controller had believed that Mr. Thurston was in any emergency, danger, or distress, he would have immediately elevated Mr. Thurston from the low "additional service" duty priority to the highest priority. He would have notified a supervisor of the emergency, and given Mr. Thurston maximum assistance.

40. The two transmissions in which Mr. Thurston suggested trouble in seeing the ground were "blocked" by other transmissions, and this should have been readily apparent to Mr. Thurston from the lack of appropriate response. Yet when he did get through to the final controller at 1826:48, Mr. Thurston did not repeat his request, and made only a routine request to confirm the frequency change.

41. At this point in the flight, Mr. Thurston could not see the ground very well. This is apparent from his communications and from his route of flight. The only real visual reference he had was the mountainside. He chose, therefore, to hug the foothills in order to maintain that visual reference. He was a VFR pilot, trained to fly by visual reference, not by reference to instruments.

42. From the time that Mr. Thurston said he was going to switch frequencies to the Bear controller to the time he actually made the switch, his airplane went from due west to a path almost due north, close alongside the foothills. He chose this route on his own, without direction from the controllers, because this route enabled him to resume visual contact with the foothills.

43. Mr. Thurston then changed radio frequencies, and spoke with the Bear position controller from 1826:58 until his last transmission at 1828:57, a period of approximately two minutes.

44. A supervisor was manning the "CI-2" coordinator position adjacent to and behind the Final controller. The CI-2 controller was assisting the Final controller with coordination with other sectors and with the Salt Lake Center. The CI-2 controller heard the communications to and from Mr. Thurston, and he did not believe there was any problem with the aircraft, from either the nature of Mr. Thurston's requests, the words chosen, or his tone of voice.

45. If the CI-2 controller had believed that Mr. Thurston was in any emergency, danger, or distress, he would have, within seconds, stepped forward to the vacant radar position located to the left of the Final controller, plugged in his headset at that position, thrown one switch to isolate communications with Mr. Thurston on his frequency (while leaving the Final controller to handle the instrument arrivals on a separate frequency), and devoted his full attention to giving Mr. Thurston maximum assistance.

46. The CI-2 controller did not say anything to the Bear controller in connection with the communications transfer of Mr. Thurston's aircraft from Final to Bear sectors, because he did not feel it was necessary, and because he also believed that interrupting the Bear controller with this routine information could be a distraction or interruption that might interfere with the Bear controller in the performance of his duties.

47. There were a total of 16 transmissions between Mr. Thurston and the Bear controller (not counting the post-accident efforts to contact the missing airplane). The Bear controller spoke with only two other airplanes during this two minute period, and devoted the majority of his time and radio transmissions to Mr. Thurston.

48. Mr. Thurston's transmission to the Bear position controller began with a routine call-up and another request for vectors to Ogden:

1826:58 N8004K Salt Lake approach Stinson zero four kilo with ya.

1827:02 BEAR (November * zero four kilo Salt Lake approach go ahead.

1827:04 N8004K Stinson zero four kilo I'm up on the mountains I wonder if you could vector me to Ogden.

49. Faced with this routine-sounding request for vectors, the Bear controller issued a discrete transponder code to permit radar identification of the aircraft, and turned his attention for the next minute to handling the arriving airline traffic which he was sequencing for approach to Salt Lake City International Airport. There were periods of radio silence during this minute during which Mr. Thurston could have declared an emergency, or made a request for additional assistance, but he did not do so.

50. During this minute, Mr. Thurston continued to hug the mountains. He could see the mountains, since it would be impossible for him to have followed the contour of the foothills so closely without maintaining visual reference to them.

51. The Bear controller's next transmission to Mr. Thurston was the standard clearance reference to the VFR Flyway: "... follow the shoreline westbound maintain VFR at or below six thousand" (Tr. 1828:20).

52. All three controllers (Final, CI-2, and Bear), up to this point, had reasonably assumed that Mr. Thurston was making rou-

tine requests for VFR navigational guidance, and that he was not in an emergency condition. The Bear controller did not undertake to guide Mr. Thurston to his destination by radar vectors. Instead, he attempted to orient Mr. Thurston to the freeway, so that he could follow the "VFR Flyway" route to Ogden.

53. This response—intermediate between providing radar vectors to the aircraft and telling the pilot that the controller was too busy to provide any radar services—is the normal, routine means of dealing with VFR aircraft in this area.

54. Throughout this period, the controllers reasonably assumed that Mr. Thurston was flying in VFR weather, and was merely seeking routine navigational guidance, which they attempted to provide him by reference to ground landmarks. Mr. Thurston's laconic responses of "negative" when asked if he could see specific ground references conveyed nothing of his actual peril.

55. Mr. Thurston then made the following transmission:

1828:25 N8004K Stinson zero four kilo I'm afraid ah you'll need to vector me away from the mountains I can't see the ground right now sir."

This transmission was the first time that Mr. Thurston clearly communicated his perilous situation to the air traffic controllers.

56. In response, the Bear controller immediately began an uninterrupted sequence of transmissions to Mr. Thurston in which he attempted to ascertain his flight conditions: asking whether he was "still in VFR conditions" (Tr. 1828:32); asking whether he had ground contact (Tr. 1829:49); observing his ground track on radar, and then issuing a suggested heading of 310 degrees (Tr. 1828:52), which Mr. Thurston acknowledged (Tr. 1828:57). That acknowledgment was the last communication by Mr. Thurston.

57. During the brief, twenty second period between the first suggestion of a potential emergency and the issuance of the 310 degree heading, several other events were occurring simultaneously.

58. The supervisor on duty, Rebecca Hinz, overhearing the "do you have ground contact" transmission, walked over to stand behind the Bear controller, where she remained. Ms. Hinz was ready to lend whatever assistance she could, but as she perceived the situation she felt the Bear controller was handling the situation appropriately.

59. In the same period, the Bear controller reached up to his radar screen control, punched the video "Map 1" button to deselect the standard Map 1 display, and punched the video "Map 5" button to select the Emergency Obstruction Video Map (EOVM) map display.

60. The changeover of the radar map display is not instantaneous, since it requires the moving "sweep" line to make one to two complete revolutions (at 4.7 seconds per revolution) to "burn in" the new map, while the old map fades out.

61. Once the map changeover was complete, the Bear controller evaluated the position of the aircraft with respect to the terrain information on the EOVM, and used this information to select the 310 degree heading which he radioed to Mr. Thurston at 1828:52.

62. In his next transmission, the Bear controller issued an "altitude alert" to Mr. Thurston:

1829:00 BEAR (Stinson)* zero four kilo altitude alert you're in a ah eight thousand two hundred minimum ah altitude area fly heading of three one zero.

This transmission was not acknowledged by Mr. Thurston. Based on radar data, ground impact occurred within seconds of this transmission.

63. In response to a telephone call from Supervisor Rebecca Hinz, Davis County Sheriffs quickly spotted the wreckage in the foothills above the city of Fruit Heights, approximately 30 miles northeast of Salt Lake City. The wreckage was at approximately 6000 feet Mean Sea Level elevation (approximately 1,800 feet above the elevation of the Salt Lake City Airport).

64. Davis County Sheriffs conducted an immediate search and rescue operation, reaching the wreckage within hours. When they reached the wreckage, it was clear that Mr. Thurston had died instantly on impact.

65. The aircraft slid for approximately 35 feet before it flipped over and came to rest inverted. Since the aircraft was substantially destroyed in the accident by collision with terrain, there is little reliable physical evidence of the pre-impact instrument readings, and no indication that any malfunction of the aircraft or its instruments contributed to the crash. Propeller damage suggested that the engine was producing power at the time of impact.

66. The wreckage trail and ground impact marks are consistent with the aircraft being flown into the mountainous terrain at normal cruise speed, with no attempt at evasive action.

67. The ground impact marks indicate that the aircraft collided with the hillside on a magnetic (compass) heading of approximately 005 degrees, impacting a hillside with a 30 degree slope. This was the exact same magnetic heading that the aircraft was flying as depicted by the last several radar "hits". There is no indication that Mr. Thurston ever commenced a turn to the 310 degree heading suggested by the Bear controller.

68. If Mr. Thurston had promptly commenced a turn to the 310 degree heading, assuming two seconds reaction time and a "standard rate" turn of three degrees per second, he would have missed the hillside with which he collided.

69. Even if Mr. Thurston had turned away in time and missed the hillside, he would still have been in a position of considerable peril, as a VFR pilot (untrained in instrument flying) facing flight solely by reference to instruments into clouds with flight conditions of turbulence, snow, and structural icing.

70. The air traffic controllers acted reasonably in response to the communications from Mr. Thurston. Air traffic controllers are not expected to be omniscient. They cannot know what is going on in an airplane unless they are told by the pilot.

71. Under the totality of all the circumstances, Mr. Wolverton, Mr. Miller, and the other air traffic controllers were not negligent. Their conduct was in accordance with responsible, competent, professional behavior

expected of air traffic controllers. They were not responsible for Mr. Thurston's death. The Court finds no degree of negligence on the part of the air traffic controllers or the Federal Aviation Administration in connection with this accident.

72. Mr. Thurston did not clearly communicate his peril and his concerns for his safety to the air traffic controllers. This accident could have been averted by Mr. Thurston at any time during the flight by flying west away from the mountains, on instruments if need be.

73. Because of the finding that the air traffic controllers acted reasonably and were not negligent, it is not necessary to make specific findings as to Mr. Thurston's negligence, and for that reason the Court declines to do so.

## II. Conclusions of Law

1. This action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* Jurisdiction and venue properly lie with this Court under 28 U.S.C. § 1346(b) and 28 U.S.C. § 1402(b), respectively.

2. Under the FTCA, the "whole law," including the choice of law rules, of the state where the alleged act or omission occurs governs the rights and liabilities of the parties. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Brooks v. United States,* 695 F.2d 984 (5th Cir.1983). This accident arises out of the alleged negligence of air traffic controllers in Salt Lake City, Utah. The substantive law of Utah controls.

3. Under Utah law, negligence is the failure to do what a reasonably prudent person would have done under the circumstances, or doing what such person under the circumstances would not have done. *Mitchell v. Pearson Enter.,* 697 P.2d 240, 243 n. 8 (Utah 1985) (quoting *Meese v. Brigham Young University, Utah,* 639 P.2d 720, 723 (Utah 1981)). The essential elements of a negligence action in Utah are: 1) a duty of reasonable care owed by the defendant to plaintiff; 2) a breach of that duty; 3) the causation, both actually and proximately;

and 4) the suffering of damages by the plaintiff. *Reeves v. Gentile,* 813 P.2d 111 (Utah 1991); *Williams v. Melby,* 699 P.2d 723, 726 (Utah 1985).

■ 4. Under Utah law, a party's negligent conduct must be a substantial factor in addition to an actual cause of plaintiff's harm. *Devine v. Cook,* 3 Utah 2d 134, 279 P.2d 1073, 1080 (1955); *Hall v. Blackham,* 18 Utah 2d 164, 417 P.2d 664 (1966); *see Allen v. United States,* 588 F.Supp. 247 (D.Utah 1984), *rev'd on other grounds,* 816 F.2d 1417 (10th Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988).

■ 5. Utah courts define proximate cause as that cause which, in a natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the result would not have occurred. *Mitchell v. Pearson Enterprises,* 697 P.2d 240, 245 (Utah 1985).

■ 6. Federal Aviation Regulations (FARs) are legal notice to the public of their content regardless of actual knowledge, *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 385, 68 S.Ct. 1, 3–4, 92 L.Ed. 10 (1947), and pilots conducting flights in the United States are required to obey them.

7. Part 91 of the FARs, entitled "General Operating and Flight Rules," contains several regulations dealing directly or indirectly with emergencies:

1) The pilot in command of an aircraft is directly responsible for, and is the final authority as to the operation of that aircraft. 14 C.F.R. § 91.3(a).

2) In an in-flight emergency requiring immediate action, the pilot in command may deviate from any rule of this part to the extent required to meet that emergency. 14 C.F.R. § 91.3(b).

3) An aircraft in distress has the right-of-way over all other air traffic. 14 C.F.R. § 91.113 (formerly § 91.67(c)).

4) When an ATC clearance has been obtained, no pilot in command may deviate from that clearance, except in an emergency, unless an amended clearance is obtained.

8. Air traffic control procedures for operating in the United States are contained in various reference materials, including a quarterly FAA publication called the Airman's Information Manual (AIM).

9. Chapter 6. of the AIM, entitled "Emergency Procedures," provides detailed recommendations for pilots faced with distress or urgency conditions. Paragraph 6–21 provides in part:

a. A pilot who encounters a *distress* or *urgency* condition can obtain assistance or other agency in whose area of responsibility the aircraft is operating, stating the nature of the difficulty, pilot's intentions and assistance desires.

b. The initial communication, and if considered necessary, any subsequent transmissions by an aircraft in *distress* should begin with the signal MAYDAY, preferably repeated three times. The signal PAN–PAN should be used in the same manner for an *urgency* condition.

10. The FARs provide that the pilot in command is directly responsible for, and is the final authority as to the operation of his aircraft. 14 C.F.R. § 91.3(a); *Redhead v. United States,* 686 F.2d 178, 182 (3d Cir. 1982), *cert. denied,* 459 U.S. 1203, 103 S.Ct. 1190, 75 L.Ed.2d 435 (1983).

■ 11. An ATC clearance, instruction, or request does not relieve the pilot of the duty and responsibility to operate his aircraft in a manner consistent the FARs and good operating practices. *See, e.g., New York Airways, Inc. v. United States,* 283 F.2d 496, 498–99 (2d Cir.1960).

12. "Whenever ATC issues a vector, a direction, or a clearance to a pilot, which in the pilot's judgment would jeopardize the safety of the aircraft and its occupants, that pilot has an absolute duty to reject the same, to so inform ATC, and to request a new direction." *In re Aircrash at Dallas,* 720 F.Supp. 1258, 1290 (N.D.Tex.1989) (citing *In re Air Crash Disaster at Boston, Massachusetts, July 31, 1973,* 412 F.Supp. 959, 968–69 (D.Mass.1976), *aff'd sub nom. Delta Air Lines, Inc. v. United States,* 561 F.2d 381 (1st Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); *In re*

*Aircrash Disaster at Boston,* 412 F.Supp. at 989; *Pan American World Airways, Inc. v. Port Authority of New York and New Jersey,* 787 F.Supp. 312, 318 (E.D.N.Y.1992).

■ 13. A pilot is required by the FARs to report any emergency to air traffic control and to keep the appropriate ATC facility advised of the flight's progress. 14 C.F.R. § 91.123; *Baker v. United States,* 417 F.Supp. 471 (W.D.Wash.1975).

■ 14. Pilots have the authority to deviate from and refuse air traffic control clearances, even in controlled airspace, if compliance would endanger the aircraft's safety. *Hamilton v. United States,* 497 F.2d 370 (9th Cir.1974).

15. A VFR pilot who finds himself in instrument weather conditions should seek emergency assistance:

> If continued flight in VFR conditions is not possible, the non-instrument rated pilot should so advise the controller and, indicating the lack of an instrument rating, declare a distress condition.

AIM, Chapter 6, § 6–11(b)(2).

■ 16. Air traffic controllers are held to a standard of ordinary care with respect to their responsibilities, *Spaulding v. United States,* 455 F.2d 222, 225–26 (9th Cir.1972), and they are required to exercise their best judgment when performing their duties. *Deal v. United States,* 413 F.Supp. 630, 639 (W.D.Ark.1976), *aff'd per curiam,* 552 F.2d 255 (8th Cir.), *cert. denied,* 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 175 (1977). The standard of care in an emergency situation is the same as the standard of care in other circumstances, *i.e.,* air traffic controllers must act reasonably under the circumstances, and the law requires them to exercise their best judgment when confronted with situations not covered by the air traffic manual. *Dyer v. United States,* 551 F.Supp. 1266, 1276 (W.D.Mich.1982) (citing *Ward v. United States,* 462 F.Supp. 667 (N.D.Tex 1978)); *Deal,* 413 F.Supp. at 630; *Daley v. United States,* 792 F.2d 1081, 1085 (11th Cir.1986). The duty owed is commensurate with the risk involved. *Daley,* 792 F.2d at 1085; *Himmler v. United States,* 474 F.Supp. 914, 928 (E.D.Pa.1979). According-

ly, it is reasonable to pay greater attention to an aircraft known to be in an emergency situation. *Daley,* 792 F.2d at 1085.

■ 17. An air traffic controller is under an obligation to act when he has reason to know that an emergency situation exists. *United States v. Furumizo,* 381 F.2d 965, 968 (9th Cir.1967); *DeWeese v. United States,* 419 F.Supp. 147, 167–68 (D.Colo.1974), *aff'd,* 576 F.2d 802 (10th Cir.1978).

■ 18. In emergency situations, air traffic controllers are to give distressed aircraft priority consistent with the rules governing separation of aircraft and to give the pilot any assistance he requests. *Deal,* 413 F.Supp. at 630. FAA employees are required to treat a situation as an emergency whenever doubt exists. *Swoboda v. United States,* 662 F.2d 326, 329 (5th Cir.1981), *cert. denied,* 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982).

■ 19. A controller has a duty to exercise judgment to attempt to avoid danger which was, or should have been, obviously imminent under the circumstances. *Himmler,* 474 F.Supp. at 931 (citing *Furumizo v. United States,* 245 F.Supp. 981 (D.C.Hawaii 1965)). Where there is sufficient time to do so, a controller must warn of dangers reasonably apparent to him. *Hamilton v. United States,* 497 F.2d 370, 375 (9th Cir.1974), *aff'g* 343 F.Supp. 426 (citing *American Airlines Inc. v. United States,* 418 F.2d 180, 197 (5th Cir.1969); *Eastern Air Lines v. Union Trust Co.,* 221 F.2d 62, 79 (D.C.Cir.1955)).

■ 20. When a controller is aware of a dangerous condition, his failure to act may constitute negligence. *Stork v. United States,* 430 F.2d 1104, 1108 (9th Cir.1970); *Furumizo,* 381 F.2d at 965. *See generally Ingham v. Eastern Air Lines Inc.,* 373 F.2d 227 (2d Cir.), *cert. denied,* 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967).

■ 21. Warnings beyond those prescribed by the aviation manuals must be given by an air traffic controller when the danger is immediate and extreme. *Dyer,* 551 F.Supp. at 1275 (citing *United States v. Furumizo,* 381 F.2d 965 (9th Cir.1967)). There

is, however, no duty to warn a pilot of a condition that the pilot should already be aware of base on his training, experience and personal observations. *Neff v. United States,* 420 F.2d 115, 120–22 (D.C.Cir.1969), *cert. denied,* 397 U.S. 1066, 90 S.Ct. 1500, 25 L.Ed.2d 687 (1970); *Pan American World Airways v. Port Authority of New York and New Jersey,* 787 F.Supp. 312, 319 (E.D.N.Y.), *rev'd on other grounds,* 995 F.2d 5 (2d Cir. 1993).

■ 22. A controller may rely on the assumption that a pilot knows and will abide by all applicable federal regulations. This includes information contained in the Airman's Information Manual, FAA advisory circulars, and aeronautical charts. *Hensley v. United States,* 728 F.Supp. 716, 722 (S.D.Fla.1989).